Robert O. McDONNELL, etc., Plaintiff,

v.

Charles WOLFF, Jr., etc., et al.,
Defendants.

Civ. No. 1722L.

United States District Court,
D. Nebraska.

April 21, 1972.

Douglas F. Duchek, Lincoln, Neb., for plaintiff.

Mel Kammerlohr, Lincoln, Neb., for defendants.

## MEMORANDUM DECISION

DENNEY, District Judge.

This case is a civil rights action challenging many of the administrative procedures and practices at the Nebraska Penal and Correctional Complex (hereafter Complex). The plaintiff, who is incarcerated at that institution, has been allowed to prosecute the case as a class action on behalf of all inmates of the Complex. Counsel has been appointed for the plaintiff and both parties have furnished excellent briefs of the arguments to the Court.

Pursuant to the pre-trial order, the issues were narrowed, then the parties filed a stipulation of facts as to those is-

sues and, as a result, some of them were resolved in the stipulation itself. Those issues that were handled in that manner are as follows:

1. Prior to October 28, 1970, there were three procedures followed in processing inmate letters to sentencing judges regarding the crediting of "dead time." ("Dead time" is time spent in jail prior to sentence, which would have no effect on the time the inmate must serve unless specially credited to the sentence by the sentencing judge.) The procedures revolved about whether the particular judge had or had not expressed a policy regarding such letters. In some instances, the procedures resulted in the letters being returned to the inmates without being sent to the judge. The parties have stipulated that since October 28, 1970, and in all future cases, all letters addressed to any judge will be mailed out by the Complex. It will be so ordered by the Court.

2. Postage has also been a problem at the Complex. Stamps, because they are negotiable, have by necessity been closely controlled. The parties have agreed that the inmate is given three free stamps per month and that, in addition, he may spend from his earnings up to $30.00 per month on postage, and that the Court should enter an order to that effect. It will be so ordered.

3. The law library at the Complex has also been a constant source of disagreement. It will be discussed in greater detail further in this opinion. The parties do agree that the procedure that allows inmates to check out books and take them to their cells is acceptable to the parties. The parties have also agreed as to general adequateness of the law library in terms of books available except for the Nebraska Statutes, which are not current. See Appendix A for a comprehensive cataloging of that library. Inmates may also purchase books for their own use.

4. Inmates desiring notary service submit an interview request to the Captain's office. Notary service is available at the Complex at 3:00 P.M. on Mondays and Fridays. Emergency notary service is done on a daily basis. The parties agree that this procedure is acceptable and the Court will so order.

To the remaining issues, the parties have made certain stipulations of facts but are not in agreement as to how the issues should be resolved. Evidence has also been taken at two hearings and by affidavit. The Court approaches these problems mindful that matters of internal prison administration should not be interfered with by the federal courts. Lee v. Tahash, 352 F.2d 970 [8th Cir. 1965]. The matters that can be examined by this court in a civil rights action such as this have been succinctly stated as:

> The Court . . . is limited in its inquiry to the question of whether or not the constitutional rights of inmates are being invaded and with whether the Penitentiary itself is unconstitutional. The Court is not judicially concerned with questions which in the last analysis are addressed to legislative and administrative judgment. A practice that may be bad from the standpoint of penology may not necessarily be forbidden by the Constitution. And a prison system that would be excellent from the point of view of a modern prison administrator may not be required by the provisions of the Constitution with which the Court is concerned. Holt v. Sarver, 309 F.Supp. 362 [E.D.Ark.1970].

5. The parties have stipulated that the inmates are denied the individual use of a typewriter. The inmate legal assistant is permitted to use a typewriter and all legal documents required by the Courts to be typewritten are typed by the inmate legal assistant at the request of the inmate. The Complex will not refuse a request for typing of such required documents. Plaintiff charges that this procedure effectively denies the inmates their rights to adequately pre-

pare legal papers. The Court is not so persuaded. So long as the Courts will either accept hand-drafted petitions or the prison will have those required to be typed so done, no rights of the inmates are infringed. There is no right to the individual use of a typewriter. Williams v. United States Department of Justice, Bureau of Prisons, 433 F.2d 958 [5th Cir. 1970].

■■ 6. The plaintiff contends that because there are reprisals by the prison officials to those inmates who petition the Courts the plaintiff's rights to access to the Courts are infringed. The defendants contend that there are no such reprisals. It has been recognized that reasonable access to the Courts is a right guaranteed against state action by the due process clause of the Fourteenth Amendment. Stiltner v. Rhay, 322 F.2d 314 [9th Cir. 1963]. Were the defendants to exact reprisals for the exercise of that right, this Court would be of the opinion that such would tend to inhibit plaintiff's rights sufficiently to be actionable. Coonts v. Wainwright, 282 F.Supp. 893, 895 [M.D.Fla.1968]. The following is the evidence as it developed as to the existence of such reprisals.

Plaintiff McDonnell testified that he originally was given as a work assignment that of clerk-typist in the reception center but that in May of 1970, on the day after appearing in Federal Court, he was reassigned to the soap factory. Warden Wolff testified that McDonnell was moved to the soap factory for security reasons, there being at that time indications that an escape attempt might be made somewhere in the prison and that McDonnell had an escape record.

Inmate Nykeil stated that he believes that the refusal of the prison authorities to allow him to enroll in college courses at the institution is based on his involvement in this law suit.

■ Plaintiff also alleges in the petition, but no proof was offered, that Douglas L. Rhodes was transferred from his prison job of clerk-typist for the Associate Warden to the particular laundry room where the laundry is filled with human feces from various State hospitals solely because he complained to this Court and that William M. Pegram was placed in a death row confinement cell solely because Pegram requested Rhodes to assist him in complaining to the Courts. The Court does recognize that the officials at the Complex may well feel justified in taking some sort of administrative action against "writ writers" whom they view as harassing the officials and interfering with the orderly administration of the institution. McDonnell and Rhodes are both well known "writ writers" having many actions of various types pending in the Courts constantly. However, the Court is not convinced that plaintiff herein has met the burden of proving that a widespread procedure of reprisals exists. The allegations regarding Rhodes and Pegram were unproved. There was apparently good reason for McDonnell's transfer at the time it was accomplished and Nykeil's statement is too flimsy a foundation to support the entire verdict sought. The Court would caution the defendants that administrative reprisals against inmates who seek access to the Courts will not be tolerated, regardless of how justified they might appear.

7. The parties have raised and stipulated to several issues regarding legal assistance for inmates in the Complex. When the inmate first arrives at the Complex, he is housed in the Reception and Diagnostic Center for a short time. See Appendix B from the *Inmate Handbook* (Published March, 1970). During this time period, the inmate is not allowed access to the Complex's law library. However, the Complex does order the inmate legal assistant to visit the Center once each week, during which time the legal assistant will help the new inmate with any pending legal action he might have or to begin a new action, if desired. The inmate legal assistant is an inmate who has been appointed by the Complex

to help other inmates in presenting their claims to the Courts. See Appendix C from the Inmate Handbook and Appendix D, affidavit of legal assistant, James Maddox. The inmate legal assistant is the only inmate specifically approved to assist other inmates in the preparation of legal documents without express approval of the Warden. The plaintiff is also not satisfied with the regulations surrounding visits to the inmate legal assistant and the law library itself. Any inmate who has indicated an interest in visiting the legal assistant may do so between the hours of 7:00 A.M. and 7:30 P.M. daily. The law library itself is open on Monday, Tuesday, Wednesday, Thursday and Friday evenings for independent research by an inmate unassisted by the legal assistant. The law library is open from 5:00 P.M. to 7:00 P.M. on Tuesdays and Thursday, and it is open from 6:00 P.M. to 7:00 P.M. on Monday, Wednesday and Friday. See Appendices E and F. An inmate is required to be back in his cell for the 7:30 P.M. lineup. For security reasons, the number of inmates that may be allowed in the library at any one time is six. Some days there are more than six requests, and some days there are less than six requests to visit the law library for independent research.

School is held on some of the same nights that the law library is open for independent research. The school classes are organized into three periods of one hour each, commencing at 5:15 P.M. and ending at 8:15 P.M. There are two classes of inmate students and the inmates' ability to visit the law library for independent research depends upon his classification as a student. Inmates under twenty-one years of age, who do not have a high school diploma, are mandatory students. Inmates over twenty-one years of age or high school graduates are voluntary students. An involuntary student, who is attending the first two periods of school, therefore has a conflict with the hours of the law library and he may be excused from school to visit the

law library only upon a showing of need to the warden. A voluntary student may miss two nights of school per week and still remain active in the program without a penalty. Involuntary students normally are able to satisfy their library needs during the daytime with the assistance of the inmate legal assistant.

Finally, the procedure is challenged that denies all inmates of the Reformatory Unit access to the law library. See Appendix G from the *Inmate Handbook* for the distinction between the Reformatory Unit and the general penal Complex. The reformatory inmates are not permitted to go to the Complex unit where the law library is located. Previously, the inmate legal assistant has been ordered to visit the Reformatory unit for one afternoon per week and to stay for a sufficient time to take care of all the reformatory inmates' requests. In addition, a small library is being established at the Reformatory unit. See Appendix D.

Danny Hart stated that he was held in solitary for three weeks in February, 1971, during which time he was not allowed to contact court appointed counsel regarding pending escape charges against him.

Solitary confinement is actually implemented in the Adjustment Center portion of the Complex. See Appendix H for the legal assistance regulations regarding the Adjustment Center.

Some of the inmates have particular reluctance to use the inmate legal assistant. McDonnell testified that he uses the inmate legal assistant but is concerned that some of the information given the legal assistant may be forwarded to the administration of the prison.

There has been a recent change in the individual who is the legal assistant in the Complex unit from James Maddox to Harold Huffman, which seems more satisfactory to the inmates. Maddox is now the legal assistant for the Reformatory unit.

McDonnell further testified that he had violated the prison rule about giving legal assistance to other prisoners but had never been punished for doing so.

■■■ The Court should first examine the inmate assistance program whereby the Complex provides for the use of the inmate legal assistant. This procedure must satisfy the test of Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 [1969] of being a reasonable alternative to allowing inmates to freely assist each other in the preparation of petitions if such a ban is imposed. The problem is discussed in Note, Constitutional Law: Prison "No-Assistance" Regulations and the Jailhouse Lawyer, 1968 Duke Law Journal 343. Here, the Complex allows for inmates to assist each other upon permission of the Warden. Assuming such permission is freely given, then it is certainly arguable that no Johnson v. Avery, *supra,* problem is presented, since the procedure and the alternative both are allowed. But at least it should seem evident, and the Court so finds, that such a regulation in conjunction with the comprehensive program of inmate legal assistance afforded by the Complex satisfies the reasonable alternative requirements of Johnson v. Avery, *supra.* This is not to say that improvements cannot yet be made. The Court is of the opinion that some of the suggestions in United States v. Simpson, 141 U.S.App.D.C. 8, 436 F.2d 162 [1970] regarding the use of law students are worthy of consideration by the Complex. Similarly, the voluntary assistance of qualified attorneys, as cited in Novak v. Beto, 453 F.2d 661, [5th Cir. 1971], is a goal to be sought. But the system presently employed by the Complex is not constitutionally defective and no major change is mandated. This Court has examined over 50 petitions in the last 12 months which have originated in the Complex. The Court has found them to be sufficiently drafted to apprise the Court of the inmate's basic claim. Often, the inmate legal assistant prepares a brief to accompany the initial petition, although such is not required, and the Court has found such briefs to be well prepared, with numerous but pertinent legal citations. In addition, the Court appoints counsel for 95% of all the habeas corpus petitions (only those involving purely questions of law are excepted) and most of the civil rights cases where complex, factual allegations are involved. It should be noted that this case itself is of the latter variety, wherein counsel was appointed.

In Johnson v. Avery, *supra,* 393 U.S. at p. 490, 89 S.Ct. at p. 751, the Court also recognized that:

[T]he State may impose reasonable restrictions and restraints upon the acknowledged propensity of prisoners to abuse both the giving and the seeking of assistance in the preparation of applications for relief: for example, by limitations on the time and location of such activities and the imposition of punishment for the giving or receipt of consideration in connection with such activities.

Thus, the remainder of the restrictions in inmate legal assistance must pass that reasonableness test.

■■■ The legal assistance procedure in the Reception and Diagnostic Center does not appear to have resulted in any loss in rights to appeal or to seek post-conviction relief. The detrimental effect, if at all, is in the area of delay in seeking such relief. Even delay is minimal, with the regular visits of the inmate legal assistant to those persons. The Court finds the regulations regarding inmate legal assistance for new inmates in the Reception and Diagnostic Center to be a reasonable restraint, during the short period of their stay, within the meaning of Johnson v. Avery, *supra.*

■■■ The interest of the Complex in minimizing the security risk in the Complex legal library by restricting to six the number of inmates in the library at any one time, thereby preventing large numbers of inmates from congre-

gating together, sustains the reasonableness of the regulation. The Court also finds that allowing inmates to visit with the inmate legal assistant between the hours of 7:00 A.M. and 7:30 P.M. daily is a reasonable restriction. However, the Court does not find that the hours during which an inmate may do independent research has any relationship in fact to the time required for such efforts. The total of approximately seven hours per week for independent research is unreasonable within the meaning of Johnson v. Avery, *supra*. The defendants will be required to amend the regulation regarding time allowed for independent research. It appears to the Court that a regulation that allows the inmate access to the legal library at any time during the periods that he has "free time" or recreation periods would meet the Johnson v. Avery requirements. This would also solve the problem of conflict with school schedules.

The not too distant past procedure of denying inmates in the Reformatory unit access to the legal library was unreasonable on its face. The right to proceed pro se if the person chooses is fundamental to our legal system. Forcing the inmate at the Reformatory unit to use the inmate legal assistant would be violative of that right. The evidence shows that recently the Reformatory unit acquired its own legal assistant and a small legal library. There being no evidence that the Reformatory unit legal library is not adequate for the needs of the inmates, the Court cannot say that the procedure as it is today is unreasonable.

The Adjustment Center where the solitary confinement is located presents, by its nature, extraordinary problems. The regulations indicate that the inmate legal assistant is available to those inmates as well, but on a weekly basis. So long as this is available to every requesting inmate weekly and that an inmate is not required to wait three weeks or more, as indicated by Inmate Hart's testimony, the Court is inclined to find the procedure reasonable. Unlimited access to other inmates and the legal library would seem to emasculate the purpose and effectiveness of solitary confinement.

8. The parties have raised and stipulated to several issues regarding censorship of mail to and from the inmates at the Complex. On May 19, 1971, Judge Warren Urbom of this District issued a temporary injunction in this case, enjoining defendants during the pendency of this suit from opening any mail from plaintiff's attorney to plaintiff or from plaintiff to plaintiff's attorney. Following that, an extensive hearing to reconsider the motion for temporary injunction was held on April 15, 1971, before Judge Urbom. Then Warden Sigler testified at length, saying that the need for censorship has only one purpose, that of security for the institution. He stated that the mails are used to introduce contraband into the prison and especially narcotics. Drugs may be dissolved in water, dropped onto the paper of the letter, then allowed to dry before mailing. The inmate at the receiving end can recover the narcotic from the paper by using a water solution again or merely eat the paper itself. Escape plans can also be devised with outsiders by the use of the mails, according to Warden Sigler. Insofar as censorship of mail between attorney and client, Warden Sigler stated that it was done because either unscrupulous or naive attorneys might introduce contraband or further escape plans. Defendants, in their brief, further describe this problem as "[p]ersons who are employed by attorneys, or even courts, or are clerking for them may, in exercise of what is commonly known as the 'Don Quixote' complex, in their zeal to change the world, unwittingly or without thinking anything wrong, use the attorneys' or courts' stationery to contact an inmate," John B. Greenholtz, who was a deputy warden for 21 years and is now chairman of the Nebraska Board of Paroles, substantiated Warden Sigler's testi-

mony. Carol Franssen, Drug Investigator for the Nebraska State Patrol, testified as to the detection of drugs that have been impregnated in paper either through visual observation or black light techniques.

Following the hearing, the temporary injunction was withdrawn upon stipulation of the parties that law students would be permitted freely to visit plaintiff and plaintiff would be transported to plaintiff's counsel's law office for consultation when requested during the pendency of this lawsuit.

At this Court's hearing on the matter on November 22, 1971, additional evidence was adduced. Now Warden Wolff further stated that, regarding Inmate Rhodes, he had been written up on the basis of slanderous, derogatory and obscene statements and that no mail from or to courts or counsel is stopped but all is opened.

Associate Warden Jones stated that a letter to anyone outside the approved mailing list must have special approval. He repeated Warden Wolff's testimony regarding the Rhodes' letters. In respect to the delay of McDonnell's mail, Jones testified that the mail that had been delayed a month was caused by unusual circumstances, namely, that McDonnell was out of the institution being tried in South Dakota on another charge. He testified that letters to Judges are not censored but that occasionally he writes on the letter the position of the institution.

The five letters of Inmate Rhodes in question have been examined by the Court. They were written on January 16, and 17, 1971. The letters to *Time Magazine* and to State Senator Ernest Chambers are fairly typical. In the letter to *Time Magazine*, some of the objectional portions included: "in many areas its worse than the publicized conditions in Arkansas prisons"; "the only suggestion of treatment here is the prison's name: Nebraska Penal and Correctional Complex"; "it is headed by Maurice H. Sigler who is so old his thinking is fos-

silized." In the letter to State Senator Ernest Chambers, the objectionable portions were "I feel it is my right—my duty—to inform the public that all is not well at the Maurice Apartments" and "some of the things I could show you at Sigler's Ghetto would shock your conscience." The Disciplinary Report indicates that the Disciplinary Board imposed as punishment for the writing of the letters that 5 days of extra earned good time be withheld and that Rhodes be placed in administrative segregation for the protection of the individual and the welfare of the institution.

Plaintiff McDonnell stated that certain of his mail has been delayed up to a month in being delivered to him.

Inmate Robert N. Pilgrim stated that he mailed a letter to Judge Van Pelt, of this District, in October of 1970, but that the Judge did not receive it until January, 1971. Earlier that year, Pilgrim received an order from the Dakota County Court, giving Pilgrim ten days in which to answer. Because the order was delayed by prison officials for six days, Pilgrim had but three days to do all the work necessary to answer the letter.

Inmate David Rice stated that on several occasions he has received letters sent to his attorney back from the mail room informing him that his attorney was not on the authorized mailing and visiting list.

Inmate Dennis Marion stated that his mail has been repeatedly tampered with and, as a result, it has taken as much as a month for him to receive some letters; that often when he sends letters out the institution does not send them out nor does he get them back.

Inmate Larry Wayne Powell stated that late in 1968 his grandmother died and that in such cases it is the policy of the institution to allow the inmate to attend the funeral. Powell was not notified of the funeral until approximately one and a half hours prior to the funeral because the letter from home was delayed three days by prison authorities.

As a result, Powell was not able to attend the funeral.

Inmate Hart stated that on March 22, 1971, all of his mailing and visiting privileges were stopped because he had allegedly mailed letters to the *World Herald* (an Omaha, Nebraska, newspaper) and Nebraska State Senator Ernest Chambers. Hart added that he is and has been denied the right to write to the United States Senator from his native state, namely, Senator Jack Miller of Iowa.

The Complex's regulations on mailing privileges as contained in the *Inmate Handbook* are set out in Appendix I. Additional regulations are to be found in Appendices J and K.

Many Courts have spoken recently on this problem of censorship. The Court of Appeals of the First Circuit recently held that an inmate's First Amendment rights extend to being allowed to correspond with the news media concerning prison matters. Nolan v. Fitzpatrick, 451 F.2d 545 [1st Cir. 1971]. That Court reasoned that:

> [T]he condition of our prisons is an important matter of public policy as to which prisoners are, with their wardens, peculiarly interested and peculiarly knowledgeable. The argument that the prisoner has the right to communicate his grievances to the press and, through the press, to the public is thus buttressed by the invisibility of prisons to the press and the public: the prisoners' right to speak is enhanced by the right of the public to hear.

As shown in Appendix I, the inmates in Nebraska Penal and Correctional Complex are prevented from writing to the news media about prison conditions. The evidence regarding Inmate Rhodes indicates that any such attempt is met with severe punishment.

In Peek v. Ciccone, 288 F.Supp. 329 [W.D.Mo.1968] the Court recognized that refusal to mail a letter to the Pope of the Catholic Church would violate the inmate's First Amendment religious freedoms. It is questionable for the Complex whether the Pope would be an allowable person on the approved mailing list, since the inmate is allowed to write to only three friends. Friends are defined as "aunts, uncles, nieces, nephews, cousins, in-laws and acquaintances". It is certain that the Pope could not be added to the approved list except during one of the following periods: January 1–5, May 1–5, or September 1–5, since those are the only times when changes can be made. See Appendix I.

The Second Circuit Court of Appeals, in Sostre v. McGinnis, 442 F.2d 178 [2nd Cir. 1971], held that:

> [I]f a communication is properly intended to advance a prisoner's effort to secure redress for alleged abuses, no interest would justify deleting material thought by prison authorities to be irrelevant to the prisoner's complaint. The danger that an official will improperly substitute his judgment for that of the correspondent's then preponderates. For similar reasons, prison officials may not withhold, refuse to mail, or delete material from otherwise protected communcations merely because they believe the allegations to be repetitious, false, or malicious.

That Court went on to hold that such protected communications were between an inmate and (a) a court, (b) any public official or agency, or (c) any lawyer.

In Rhem v. McGrath, 326 F.Supp. 681 [S.D.N.Y.1971], the Court examined the censorship regulations of the Manhattan House of Detention and found that there were no restrictions upon outgoing mail.

In Palmigiano v. Travisono, 317 F. Supp. 776 [D.R.I.1970], the Court questioned: "Why should there be any limitation on the number of correspondents except as it may be based on the amount of time available to the inmate for writing letters and the amount of physical space and facilities available?"

This Court is of the opinion that a relaxation of the Complex's rules on censorship of letters to the news media and public officials and limits on numbers of persons to whom letters can be written would aid in the prevention of that which the Complex fears the most, namely riots. It seems that all too often it is the need and frustration to demonstrate to the outside world their complaints that precipitates such disasters as the Attica riots. Whether such a relaxation is constitutionally mandated as the previous cases indicate, this Court does not at this time need to decide. Herein, the plaintiff has directed his attack at censorship between counsel and the inmate and the recent case of Moore v. Ciccone, 459 F.2d 574 [8th Cir. 1972], decided during the pendency of this case, appears to have settled the matter for this Court.

In that case, the 8th Circuit focused on the right to access to the Courts instead of the inmates' First Amendment rights, although that Court has recognized that inmates have First Amendment rights, Rowland v. Jones, 452 F.2d 1005 [8th Cir. 1971], delineating as the scope of the censorship of mail between inmate and attorney to be as follows: Outgoing mail may not be inspected or opened; incoming mail may be opened only if manipulation of the envelope, use of fluoroscopes and metal detectors or other alternate means to opening the envelope fail to disclose contraband and there is a real possibility that contraband will be included in mail from an attorney; in addition, if the envelope from the attorney is marked "Privileged" it cannot be opened except in the presence of the inmate addressee. That Court further emphasized the importance of immediate delivery of mail. From the evidence submitted herein, this Court is convinced that a rule that requires all mail to be delivered within 48 hours of receipt at the Complex is the permissible outside limit that the Complex may delay mail, without violating the right of access to the Courts. Similarly, the Court cannot condone procedures that would allow the Complex any longer time to delay where the inmate initiates the mailing. Initiate means, in this instance, from the time the letter is sealed by the inmate for mailing. The Complex will be required to modify its regulations regarding censorship of mail to and from attorneys in accordance with Moore v. Ciccone, *supra*, as interpreted by this Court. It is axiomatic that no less can be tolerated for mail to and from the Courts themselves.

9. Lastly, the parties have raised and stipulated to issues regarding the loss of good time at the Complex. The various Nebraska statutory provisions regarding good time are found in Appendices L, M and N. It should be noted that § 83–1,107, Appendix M, makes a distinction between statutory good time which shall be credited and meritorious good time which may be credited. A good discussion of the distinctions between the two types of good time can be found in Sawyer v. Sigler, 320 F.Supp. 690 [D. Neb.1970]. The regulations regarding good time as contained in the *Inmate Handbook* are found in Appendix O. A sampling of the rules for which violations thereof have resulted in the loss of good time can be found in Appendix P. The most recent regulations regarding the Adjustment Committee (the quasi-judicial board that passes on inmate infractions, formerly the Disciplinary Committee) for the penitentiary unit can be found in Appendix Q. There are some very similar regulations in force for the Reformatory unit.

At the hearing that this Court held, the following additional evidence was adduced.

Warden Wolff testified that the procedure used now by the prison in taking away good time is as follows:

(a) The chief correction supervisor reviews the "write-ups" on the inmates by the officers of the Complex daily;

(b) the convict is called to a conference with the chief correction supervisor and the charging party;

(c) following the conference, a conduct report is sent to the Adjustment Committee;

(d) there follows a hearing before the Adjustment Committee and the report is read to the inmate and discussed;

(e) if the inmate denies charge he may ask questions of the party writing him up;

(f) the Adjustment Committee can conduct additional investigations if it desires;

(g) punishment is imposed.

Warden Wolff stated that only a small number of the write-ups are forwarded to the Adjustment Committee, with most being resolved without action at the lower levels.

Plaintiff McDonnell stated that on occasion he had been called before the disciplinary committee but was not made aware of the charge until after he arrived before the committee.

Inmate Robert Emory stated that he had lost good time for such things as messing up the "count up" (5 days), cussing a guard, and bringing a sandwich into the shop. In none of these instances was Emory taken to the Adjustment Committee for hearing. When Emory has been before the Adjustment Committee the Committee has never failed to have taken good time away.

Inmate James E. Botts stated that in January of 1971 he was taken before the Disciplinary Committee and charged with taking part in an "insurrection" by black inmates. He was found guilty and punished by forfeiting 90 days good time and being placed in segregation for 14 days.

Inmate Ronald Jackson stated that in July and September of 1971 he was charged with cursing an officer and threatening his life, for which Jackson lost 70 days of good time.

Inmate Roger Simons stated that at various times he has had either 5 or 10 days good time taken away for such infractions as "no socks", "being on the wrong tier", "no shave" or "contraband in his cell". Simons stated that at no time was he warned of the violations until the good time was taken away and the officer who accused him was not present at any of the proceedings.

Inmate David E. Nykeil stated that he appeared before a special disciplinary court in August of 1969 because he had refused to change cells; that he was not allowed to tell his side of the story; and was subsequently confined in a "dry cell" (without benefit of running water or a toilet) for 4 days.

Inmate Douglas Montgomery stated that he was before the Adjustment Committee on September 19, 1969, for defending himself in a fight, despite witnesses to the effect that he did not start the fight. The punishment that he received was loss of all good time, placement in a dry cell in solitary confinement, and, as a consequence, had to wait an additional six months for parole.

Inmate Rice stated that in June of 1971 he was sent to the Adjustment Committee for refusing an order to work, but that during the hearing he was not allowed to produce his own witnesses, nor was he allowed to confront his accuser. The punishment was loss of good time and 5 days in solitary confinement. On another occasion, Rice was written up for refusal to work when he was, in fact, in the hospital, and that when the true situation was learned the decision of the Adjustment Committee was to hold the report in abeyance. Rice believes this gives the Administration a future weapon and that the report should have been destroyed.

Rice said that he has been before the Adjustment Committee several times, but in no instance was the accusing officer present. According to Rice, although he has been before the Adjustment Committee nine times, he has never been made aware of the charge before arriving at the hearing. On September

8, 1971, Rice was sent to the adjustment center for 43 days for failure to get a conforming haircut and suffered a loss of some good time as well. Of the 43 days, 12 were spent in a dry cell.

Inmate David Wade stated that he has appeared before the Adjustment Committee several times and that in none of the instances was the reporting officer present.

Inmate Gary Flynn stated that he had been before the Adjustment Committee four times for being drunk and that in none of the instances was the officer present who wrote him up.

Inmate Bobby Lee Maxwell stated that in his hearing before the Adjustment Committee he was not allowed to call any witnesses to support his side of the case and that none of the accusers was present. Maxwell added that he has lost all the good time he could possibly earn in the future, which includes statutory good time.

Inmate Terry Owen stated that in January of 1971 he had 5 days of good time taken as a result of a peaceful strike and the following day 90 additional days for the same offense. Later, Owen stated that he had 5 days of good time taken, his mailing and visiting privileges suspended and was placed in solitary confinement and on a restricted diet for "cussing an officer." In the latter hearing, the accusing officer was not present.

Inmate Donald Johnson stated that he was called before the Disciplinary Committee and charged with "sniffing". Johnson was not informed of the charge in advance and the accusing officer was not present. He lost all his good time and was sent to solitary for 9 days.

Inmate James Rollins stated that on April 28 or 29th, 1971, he had a hearing before the Adjustment Committee and lost 38 days extra earned good time and 16 months statutory good time without the accusing officer being present.

Inmate Anthony Jay Rogers stated that around January of 1970 the warden called all the inmates together and said that he was not absolutely sure he could still give extra good time for giving blood. Inmates continued to give blood in 1970 and all inmates who were paroled or discharged in 1970 were given credit for their "blood-time." But then, on January 1, 1971, the inmates still in prison lost all the blood-time which, for Rogers, amounted to 45 days.

Inmate Hart stated that he was placed in solitary for a month for organizing a protest against the warden.

Inmate Harold L. McGhee stated that he had on occasion lost good time without being notified as to amount, when taken, or for what reason.

Inmate Sammie L. Barbary stated that he had 90 days of good time taken for a sit down strike, during which the inmates were trying to get a better policy at the institution.

Inmate Dan Oldfield stated that in November of 1970 he lost 15 days of good time for "loitering." Oldfield was not notified of the charge prior to hearing and the accusing officer was not present.

It is evident that the procedure described by Warden Wolff in his testimony has not in practice been followed in all instances.

Courts have begun in recent years to recognize that fundamental due process is a right of all persons, including inmates, and have specifically held that before good time or other substantial rights may be taken there must be an impartial tribunal, notice, a hearing, a right to cross-examination of adverse witnesses, that the decision be based upon evidence adduced at the hearing, and that the inmate be allowed representation if he so desires. *See, e. g.,* Landman v. Royster, 333 F.Supp. 621 [E.D.Va.1971].

However, the Eighth Circuit has not yet followed the trend regarding application of procedural due process to good time revocation, but continues to view the problem in terms of the right/privilege dichotomy that was popular prior to Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 [1970] and its progeny. Douglas v. Sigler, 386 F.2d

684 [8th Cir. 1967]. Such a position was recently affirmed in Morrissey v. Brewer, 443 F.2d 942 [8th Cir. 1971], which, although the question was then of parole revocation, must be applicable to good time as well. *See* Judge Urbom's memorandum and order of dismissal in McCoy v. Sigler, CV 71–L–119 [unreported memorandum D.Neb. May 13, 1971]. Thus, at this time, the Court will be compelled to hold that defendants must follow the Nebraska statutory procedure and no more. Were the Court free to decide, it would be inclined to follow the lead of the cases such as Landman v. Royster, *supra*.

The Nebraska statutory language of § 83–1,107 is to the effect that good time may be taken away "after the offender has been consulted regarding the charges of misconduct." Further, § 83–185(2) provides that "[e]xcept in flagrant or serious cases, punishment for misconduct shall consist of deprivation of privileges. In cases of assault, escape, attempt to escape or other flagrant or serious misconduct" . . . the good time provided for in § 83–1,107 may be withheld. Failure to meet the statutory requirements of consultation and flagrant or serious conduct would result in a violation of federal due process. Rueth v. Sigler, CV 71–L–251 [unreported memorandum, D.Neb. Nov. 19, 1971].

In the case at bar, the evidence is insufficient to show that any inmate was deprived of the statutory right to consultation. According to Warden Wolff's testimony consultation occurs at various levels in the adjustment process. The Court is not convinced that consultation by other than the Adjustment Committee itself satisfies the statutory requirement. However, the evidence that such consultations by the Committee do not regularly occur is isolated and confined to the statement of Inmate Emory. The Court is not convinced that the plaintiff has carried the burden of showing any deprivation of due process in this area of good time revocation.

Reviewing the evidence previously summarized, it appears that good time has been revoked for such infractions as (a) messing up the "count up," (b) cussing a guard, (c) bringing a sandwich into the shop, (d) insurrection, (e) refusal to work, (f) threatening an officer's life, (g) "no socks", (h) being on the wrong tier, (i) no shave, (j) contraband in cell, (k) refusal to change cells when ordered, (l) fighting, (m) nonconforming haircut, (n) drunkenness, (o) sniffing, (p) organizing a protest, and (q) loitering. The question now for the Court is which of these infractions are within the statutory language of flagrant or serious misconduct, for which good time may be taken. Examples of flagrant or serious misconduct are given by the statute as "assault", "escape", and "attempt to escape". It seems apparent to the Court that fighting and threatening an officer's life would be within the statutory definition. It seems equally apparent that "messing up the "count up", cussing a guard, bringing a sandwich into the shop, "no socks", no shave, and failure to have a conforming haircut are not within the statutory definition and for which deprivation of privileges is the appropriate punishment. The defendants will be required to restore all good time taken for such offenses. On the other hand, such offenses as refusal to work, being on the wrong tier, contraband in cell, refusal to change cells when ordered, drunkenness, sniffing, organizing a protest and loitering are in the gray area of the statute and best left to the judgment of the Adjustment Committee, based on the facts of each case.

Inmate Rogers' statement regarding loss of blood time, in light of the provisions in the *Inmate Handbook, see* Appendix O (which was not shown in the evidence not to be still in full force and effect) amounts to a denial of due process. Defendants will be required to recredit all blood time earned by plaintiffs in 1970 and taken away on January 1, 1971.

An order in accordance with this Memorandum will be entered contemporaneously herewith.

APPENDIX A

CONTENTS OF INMATE LAW LIBRARY

Northwestern Reporter, 1st Series, Volumes 1–300.
Northwestern Reporter, 2nd Series, Volumes 1–112, Bound. Soft Back, 169–186.
Nebraska Reports, Bound Vols. 168 to 184.
Nebraska Supreme Court Journal, (subscription) 183 to 187.
Nebraska Digest, Vols. 1 to 12 and Index.
Attorney Generals Reports, Nebr. 1957 through 1964.
Laws of Nebraska, Bound vols, for 1957, 1959, 1961, 1963, 1965, 1967, 1969.
Laws of Nebraska, preliminary print, 1971.
Nebraska Statutes, 1964 Edition, Cum.Supp.1961, 1963, 1965, 1967.
Shepards Nebraska Citations, Cases analyzed, 1969 Bound Volume.
Shepards Nebraska Citations, Const.Laws.Stats.Rules, Analyzed, 1969 Bound Vol.
Subscription to Nebraska Citations
Supreme Court Reporter, Bound vols 57 through 81a, Advance sheets, 87 through 90.
U. S. Reports, Preliminary Prints, 368, 375 through 403 (subscription)
Preliminary Prints advance sheets from Clerk U.S.Sup.Ct.Ea.Week.
U.S.C.A. 1970 Bound, 18, 28, 42–U.S.C.A. 1971 Title 1 to End.
United States Code, 22 Bound Volumes, 1961
United States Code, 8 Bound Volumes, 1964
Shepards U. S. Citations, Bound volumes 1964.
Shepards U. S. Citations, 1971 advance sheet.
Shepards Federal Reporter Citations, 1967 Advance Sheet.
Shepards Statutes of Court Rules, 1943–1964.

Federal Supplement, from 235 F.Supp. to 324 F.Supp.
Federal 2d Reporter, from 335 F.2d to 440 F.2d.

American Juris. Legal forms, vols. 1–14.
American Juris. Volumes 1 to 58.
Corpus Juris. Vols. 1 to 71
A.L.R.2d vols. 1–4, 1960–1964.
Reids Branson, Instructions to Juries, vols. 1–5a.
American Law and Procedure, Bound vols. 1–14.
Whartons Criminal Law and Procedure, vols. 205.
Whartons Criminal Evidence, Vols. 1–3.
Blacks Law Dictionary, 1968 Edition.
Rules of Civil Procedure, and title 28, 1968 Edition.
Rules of Criminal Procedure, and Title 18, 1968 Edition.
Prosser on Torts
Carrington, Civil Procedure—cases and comments.
Perkins, Criminal Law.
Perkins, Cases on criminal law and Procedure.
Sullivan, et al—Administration of Criminal Justice—cases and comments.
Sullivan, et al—Administration of Criminal Justice—cases and comments, 2nd edition.
Inbau—cases and comments—Criminal Justice.
Jones, et al—Cases and Materials on Contracts.
Bade—Cases on real property.

Babb—Negotiable Instruments.
McKelvy on Evidence.
Rottschaifer—A Handbook of American Constitutional Law.
Holmes—The Common Law
Wiener—Briefing and Arguing Federal Appeals.
Trumbull—Materials on Lawyers Professional Responsibility.
Evidence, Nebraska Bar Association.
Dickerson—Fundamentals of Legal Drafting.

STATE OF NEBRASKA ⎫
                  ⎬ ss.
COUNTY OF LANCASTER ⎭

I, Jimmy D. Maddox, being first duly sworn, depose and state that the foregoing in (sic) a true and accurate list of the legal Books and materials presently in the Inmate law library and available to all inmates of the Pen Unit of the Nebraska Penal Complex.

/S/   Jimmy D. Maddox

Subscribed and Sworn to before me this 10 day of September, 1971.

Signature of Notary not visible.

## APPENDIX B
### RECEPTION AND DIAGNOSTIC CENTER

The first month of your stay will probably be more difficult for you than any other period. You must get used to the new surroundings, people, and restrictions that will be imposed upon you because of your loss of freedom to do as you wish. You will not be allowed to participate in some of the activities of the complex which will later be open to you.

This first month of your stay here is referred to as the Orientation Period, and there are reasons why you receive special treatment during this period of time.

First of all, it is necessary to avoid the possibility of communicable diseases which might be carried in with a new man. It is necessary that you be available for examinations, testing and interviews with staff personnel.

Also during this period of time, the rules and regulations to which you will be expected to conform will be explained to you. You will be advised as to why these regulations are in effect by the Director of the Reception and Diagnostic Center. It is not expected that you will agree with all of the rules. However, by trying to understand the reasons for them, you should be able to avoid any unnecessary situations which could prevent your making the best possible use of the time you have to do.

During this first month various department heads and supervisors will describe and explain the different programs and self-betterment activities in which you might participate. You will have to work. The complex would prefer that the work you do and the programs you participate in will help you become better equipped and determined to earn an honest living when you are released.

While all this is going on, a thorough investigation of your past history will be made so that an accurate case study can be compiled.

Upon completion of your orientation period, you will appear before the Initial Classification Committee. Here, decisions will be made as to your initial custody, unit, living quarters, job assignment, school program, vocational training and other requirements necessary during your stay in the complex. These decisions are based on your past history, and the institutional record of your accomplishments or lack of them.

## APPENDIX C

*Legal Work*

A legal advisor has been appointed by the Warden for the benefit of those offenders who are in need of legal assistance. This individual is an offender who has general knowledge of the law procedure. He is not an attorney and can not represent you as such.

No other offender than the legal advisor is permitted to assist you in the preparation of legal documents unless with the specific written permission of the Warden.

All requests to see the legal advisor or to do legal research in the legal library, must be submitted to the Captain's Office, who will then place you on a pass to see the advisor or to do legal work.

Legal material in the library cannot be taken to your living quarters.

Any time it is necessary to have legal papers notarized, send an interview request to the Captain's Office, stating your need.

## APPENDIX D

The duties of the Inmate Legal Assistant are to assist any inmate unable to help himself in presentation of his claims of deprivation of his constitutional rights to the Court. Once the initial petition is prepared and submitted to the Court, and an attorney is appointed, the responsibility of the Inmate Legal Assistant is terminated.

Each New receptee is advised of his rights of appeal during his first week in the Reception Center. Should he wish to appeal his sentence or conviction, special forms for notice of appeal have been prepared for just this purpose. The inmate simply fills in the blanks with the necessary information, has them notarized and mailed to the Court.

Any Inmate that wishes to make use of the Inmate law library, for his own personal research, fills in the special request and submits it to the Captains Office indicating the date he wishes to have access to the Law Library. The available nights, are Monday through Friday.

Should any inmate of the Pen Unit wish to prepare his own personal petitions, and then have them typed by the Legal Assistant, he simply indicates the Number of copies he wishes and they are typed and returned to him. Should the Inmate wish to type his own petitions, a typewritter has been supplied for just this purpose. Any inmate may use the typewriter during Legal Research hours. If an Inmates Brief is to the Nebraska Supreme Court or the Eighth Circuit Court of Appeals, facilities have been arranged so that the legal Assistant or the Inmate only has to type the original Copy, the rest is photostated and duplicated in the Records office.

Inmates of the Reformatory Unit can consult with the Legal Assistant from 12:00 noon to 5:00 p. m. every thursday. At the Re-

formatory Unit, Reference books and other legal Material have been provided for the inmates. All duplicate books are transferred from the Pen Law Library to the Ref Unit. But should any book desired by an inmate not be in the Ref Unit library but in the Pen Unit Library, this Book is brought with the Legal Assistant on Thursday and checked out to the Inmate who must return the Book on the Following Thursday. Should the book not be found in either Library, it can be obtained from the Librarian at the University of Nebraska Law Library, arrangements have been in effect for the past Eight Months to loan any volume to the Legal Assistant for a period of 10 days.

During each Thursday visit to the Reformatory, every inmate who has requested an interview is called in to talk to the Legal Assistant, since its implimation (sic) over Eight Months ago an average of 9 Inmates are seen each Thursday, some weeks the total in (sic) only 5-6 other weeks as high as 15. During these interviews, the inmates problems are discussed and the best course of action is determined. If the inmate wishes to file under the post-conviction act, special writ forms have been prepared, (similar to the Federal Habeas Corpus form) should the inmate wish to institute divorce proceedings he is then referred to the Lincoln Legal Service Society.

Books and Material available at the Ref Unit are:

REVISED STATUTES OF NEBRASKA, COMPLETE, 1964 EDITION, CUM.SUP. 61 & 63
FEDERAL REPORTER 2d SERIES
FEDERAL SUPPLEMENT
SHEPARDS CITATIONS
OTHER REFERENCE BOOKS

/S/ Jimmy D. Maddox
JIMMY D. MADDOX
INMATE LEGAL ASSISTANT

APPENDIX E

M-71-403

To: All Inmate Bulletin Boards
From: Maurice H. Sigler, Warden
Date: June 8, 1971
Re: Inmate Law Library

Any person wishing to use the inmate law library for legal research must fill out the legal research pass request (blue form) that is maintained by the officer in each living quarters.

This request must be turned in to the cellhouse officer prior to 12:00 noon on the date you wish to have the pass issued. These requests will be forwarded to the Captain's Office and a decision made, because of limitation of numbers who will be allowed to be in the area at one time, as to who will be allowed to do legal research on a given date, and the pass will be issued.

This procedure is being written to try to avoid any delay of those wishing to exercise their legal rights by utilization of this legal library.

/S/ Maurice H. Sigler
Warden

APPENDIX F

M–71–402

To:      All Concerned
From:    Maurice H. Sigler, Warden
Date:    May 25, 1971
Subject: Hours for Inmate Law Library and Legal Research

For the purpose of legal research, the following hours will be observed:

Monday evening, one hour from 6:00 to 7:00 p. m.
Tuesday evening, two hours from 5:00 to 7:00 p. m.
Wednesday evening, two hours from 5:00 to 7:00 p. m.
Thursday evening, two hours from 5:00 to 7:00 P. M.
Friday evening, one hour from 6:00 to 7:00 p. m.
Reformatory Unit, Thursday from 12:30 to ~~2:30~~-p. m.
                         5:00 p. m. (handwritten)

/S/ Maurice H. Sigler
                                          Warden

Distribution:
Inmate Bulletin Boards
Warden
All Staff Members
Lieutenants
File

APPENDIX G

REFORMATORY UNIT

The Reformatory Unit is classified as a median institution and is designed in general for the benefit of the first offender of a non-violent offense. The specific function is to help you plan and carry out an institutional program which can equip you for useful citizenship upon release. Job assignments, educational facilities, vocational training, self-improvement groups, group therapy and recreational facilities are a few of the areas available in helping make this time serve you.

Should you have any problems or questions, contact the Associate Warden-Reformatory Unit, or your Counselor by means of an interview request.

APPENDIX H

M–71–406

DATE:     June 30, 1971
TO:       All Concerned
FROM:     Maurice H. Sigler, Director
SUBJECT:  Adjustment Center Legal Counsel

In order to insure the most effective method of facilitating individuals use of the legal assistant, it has been necessary to change the scheduling. In the future, the following procedure will be used for those inmates living in the Adjustment Center requiring legal assistance.

Effective immediately the inmate Legal Assistant James Maddox, #24017, will be escorted by a shift lieutenant, Thursday Mornings

at 9:00 A.M. to the Adjustment Center for legal counseling and remain until 10:45 A.M. if necessary.

Maddox, will be stripped and searched when entering and before leaving the Adjustment Center, also any legal materials in his possession (sic) will be searched by the escorting lieutenant. The North Conference Room will be used for legal assistance. Adjustment Center Inmates who request legal assistance will be seen at this time. (Only one Adjustment Center Inmate will be permitted out of his cell and in this room at one time.)

There will be the escorting shift lieutenant and one extra officer in the Adjustment Center where the Inmate Legal Counselor is interviewing Adjustment Center Inmates.

/S/ Maurice H. Sigler
Maurice H. Sigler, Director
Division of Corrections

## APPENDIX I
### MAILING AND VISITING PRIVILEGES

Mailing and visiting will be an important part of your life while you are here, therefore, it is necessary that you know all the regulations. During the Orientation Period a mailing and visiting list will be made. Immediately after investigation and approval, you will be allowed to write to the following persons who are described as your immediate relatives: your parents or step/parents; wife; your children; grandparents; brother and sisters.

Mailing and visiting regulations permit you to have a total of ten (10) separate units on your list. You are allowed to have no more than three (3) friends, including one female friend.

Those persons classified as friends are: aunts, uncles, nieces, nephews, cousins, in-laws, and acquaintances. These persons must first be approved and will not be added to your mailing and visiting list until a complete investigation has been made.

Correspondence and visiting with one (1) female friend is permitted only when it is determined that both you and the female friend are single and free to marry. She must be eighteen (18) years of age or older and must have her parents or guardian's consent unless she is over twenty-one (21) years of age.

Three (3) free stamp credits are furnished to each offender per month, for three (3) free letters. This is paid by the complex. Any remaining letters must be paid for by you through the purchase of stamp credits from the inmate stores. The three stamp credits may be accumulated until the end of the respective year, at which time, if the stamp credits are not used they will be erased from your postage account. Postage stamps are contraband and are not allowed in your possession at any time.

Mailing and visiting regulations do not permit you to have the following on your list:

1. Co-defendants (persons involved in your crime.)
2. Children under the age of 18 other than your own children and your brothers and sisters.

3. Minors over 18 years of age without the consent of their parents.

4. Married women, other than your wife, daughters, mother, sisters, and grandmothers. The husbands must be present when they visit.

5. Patients or offenders of other institutions, parolees, or probationers, unless they are members of your immediate family, and may be restricted to correspondence only.

6. Persons with a police record.

Once your mailing and visiting list has been compiled, no additions or deletions to your list may be made on other than the following dates:

Jan. 1–5          May 1–5          Sept. 1–5

Any time you have a change of address, send an interview request to the Mail Room, giving them the following information:

Old Address

Mr. & Mrs. John & Mary Doe
132 S. Main Street
Anywhere, Nebraska          68502
(brother/sister-in-law)

New Address

Mr. & Mrs. John & Mary Doe
1001 Pie Square
Somewhere, Nebraska          68501

Do not attach letter for mailing to the kite.
Deposit the letter in regular mail box.

You are permitted to write six (6) letters a week to those on your approved list. This number does not include business or legal letters. Notwithstanding restrictions on correspondence required by security and administrative reasons, business letters will be screened by the institutional counselors and legal documents (courts, judges) will be sent to Associate Warden-Reformatory or Associate Warden-Treatment for processing. The contents of the letter itself must be confined to strictly the special purpose for which the letter is intended. Letters directed to the Governor, Secretary of State, Attorney General, Director of Corrections, may be sealed and sent out. These letters are forwarded to the Associate Warden-Reformatory or Associate Warden-Treatment for mailing. All other letters must be left unsealed.

All incoming and outgoing mail will be read and inspected by the mail room officers and must be in English. The writing must be legible and large enough to be easily read. Letters must be written or printed on one sheet of stationery (J–304) using both sides of the sheet if necessary. Only one letter per envelope is allowed. Make certain you leave enough space at the bottom of each letter for your full name and number. It is necessary that your name and number be written on the inside of the flap of the envelope and that your committed name appears on the line provided on the face of the envelope. Mail not conforming to these practices will be rejected. The only exception to the single sheet of paper per letter is the sending of the *Forum,* school progress reports or the church bulletin without special permission. Letters received must be destroyed after thirty (30) days. The only

exception are legal letters approved by Associate Warden-Treatment or Associate Warden-Reformatory.

Letters will not contain vulgar, obscene, offensive or threatening language in bad taste.

Letters must not contain reference to name of position of any officer or official of the complex.

Letters must not refer to events in or about the penal complex, such as escapes, disciplinary procedures, control measures, administrative procedure or about official affairs of the complex. Letters cannot contain reference to another offender or to criminal incidents.

When writing letters, you cannot ask for money and/or make any hint that you need money.

Should your people, however, desire to send you money, it must come in the form of money order or bank draft. Cash will not be accepted nor personal checks.

Every living quarters has a mail box which is provided for approved inmate mail. Should you have any question on this, ask your living quarters officer.

## APPROVED YEARLY PACKAGES

### PENITENTIARY UNIT
1. Tooth brushes
2. Shaving brushes
3. Safety razor & blades
4. Shoes, black or brown oxfords
   or loafers, with *rubbers heels* only.
5. Guitars, with permission of Assoc.
   Warden-Custody

### REFORMATORY UNIT
1. Tooth brushes
2. Shaving brushes
3. Safety razor & blades
4. Shoes, black or brown oxfords
   or loafers with *rubber heels* only.
5. Guitars, with permission
6. Transistor radio, with permission
7. Watches, with permission

### HOLIDAY PACKAGES

1. Limited to five (5) pounds
2. Received only during Dec. 15 through Jan. 1
3. Shelled nuts only
4. Fresh fruits, except grapes
5. Commercial candies, in original pkg. only
6. Only one (1) pkg. from approved correspondent.

Holiday package requirements are subject to change, and if so it will be corrected by holiday package change slips and bulletin board memo.

The following are common articles which are not acceptable at any time:

1. Stamps
2. Home-cooked food & candy
3. Chewing gum
4. Lighter fluid
5. Cigarettes-tobacco
6. Sugar
7. Matches
8. Cash or personal checks
9. Liquids
10. Sealed containers
11. Any type tools
12. Clothing
13. Magazines
14. Newspapers

Greeting cards may be sent to anyone on your approved list and will not be counted against your weekly quota if it has only your signature. Greeting cards sent to persons not on your approved list must be channeled through your chaplain or parole counselor with only your signature and will not be counted against your quota.

Pictures may be sent to you from persons on your approved list. One (1) unframed picture no larger than 8 x 10 can be in your possession with a reasonable number of wallet size pictures. Pictures must be in good taste and cannot be obscene in any manner.

All subscriptions for magazine or newspapers will be handled by the Hobby Association officer.

Newspaper clippings cannot be received or sent out in any letter without approval.

## VISITING

It is important that you become thoroughly familiar with the regulations governing visits. You should explain these fully to members of your family and friends, so that they will not be inconvenienced and make useless trips to the institution and then learn they will not be able to visit you.

Visiting hours for inmates living inside the walls at the Penitentiary Unit are Monday through Friday from 12:00 noon to 3:45 p. m., excluding holidays and Board of Parole day—usually the third Thursday of each month.

No visiting privileges will be allowed men during the Orientation Period.

Visiting hours at the Trusty Dorm, Penitentiary Unit, are on Saturdays only from 12:00 noon to 3:45 p. m.

It is your responsibility to notify your authorized visitors as to where and when you can visit, as you are allowed two (2) visits a month. The number of visitors present at any time is subject to limitation. Normally three (3) adults can visit at one time.

Visiting hours at the Reformatory Unit are Saturdays, Sundays from 8:00 a. m. until 3:30 p. m. One special Holiday visit, that being Christmas. Visits are allowed on either a Saturday or Sunday of a given weekend, but not both.

Smoking is permitted in the visiting room, therefore, you may bring a sealed package of cigarettes or cigars. The only other articles you can carry with you on visits are your lighter, a comb and handkerchief. The wearing of a wrist watch, a ring, or a religious chain is permissible.

Visitors may purchase two (2) packages of cigarettes for you from the vending machine. (An offender is not permitted to handle any money at any time.) The cigarettes must then be given to the officer in charge of the visiting room, who will put your name and number on them and send them to your living quarters. You cannot carry cigarettes that have been bought for you back to your living quarters.

Except for candy bars eaten in the visiting room and cigarettes smoked in the visiting room, you may not accept anything from a visitor and you may not give anything to another person (visitor) at any time.

Moving from one visitor to another is not permitted.

A strip shakedown will be given before and after visiting.

Rule of Reason must govern you while visiting. Any behavior in poor taste may result in the restriction of the privilege of visiting.

Special visits from Attorneys, Ministers and Law Enforcement Officers must be arranged in advance with the Associate Warden-Treatment, Associate Warden-Reformatory, or Associate Warden-Custody.

## APPENDIX J

M–71–401

MEMORANDUM

Date:    April 1, 1971
From:   Maurice H. Sigler, Warden
To:      All Inmate and Employees
Subject: No Limit Mailing

Effective this date, certain major changes will be made to the existing mailing procedure for inmates confined within the Nebraska Penal and Correctional Complex.

The primary change is effective this date, which will permit inmates to write any number of letters to persons on their authorized correspondence list and will be known as "No Limit Mailing".

In addition to this, in the future, all inmates will be permitted to use two (2) pages of inmate stationery in each letter mailed if desired.

If an individual is involved in misconduct and is brought before the Adjustment Committee and disciplinary action is found to be necessary, the No Limit Mailing privilege will be revoked automatically on the date of the Adjustment Committee action. When No Limit Mailing is revoked, a man will be limited to mail six (6) letters per week for one (1) calendar year. The same action would apply if a man has a poor work report submitted on him in any given month.

At the end of a full year without misconduct, an individual may request to be reinstated on No Limit Mailing through the Sub-Classification Committee.

In the future, new men placed in the population of either institution will automatically be placed on the No Limit Mailing as long as each individual maintains a clean institutional record.

/S/ Maurice H. Sigler
Maurice H. Sigler, Warden

## APPENDIX K

M–71–399

MEMORANDUM

Date:      April 1, 1971
From:    Maurice H. Sigler, Warden
To:        All Inmates and Employees
Subject: Bonus Visiting

Effective this date, a new and innovative approach has been made in the existing visiting procedure for the Penitentiary Unit of the Nebraska Penal and Correctional Complex. The term will be known as "Bonus Visiting".

The Bonus Visiting will involve all men who are presently confined in the Penitentiary Unit, regardless of past institution adjustment or disciplinary offenses. Each will be approved to have three (3) visits each month, and will continue to be given on an individual basis each month as long as the individual maintains a clean institutional record.

If an individual is involved in misconduct and is brought before the Adjustment Committee and disciplinary action is found to be necessary, the Bonus Visiting will be revoked automatically on the date of the Adjustment Committee Action. When Bonus Visiting is revoked, a man will be limited to two (2) visits per month for one (1) calendar year. The same action would apply if a man has a poor work report submitted on him in any given month.

At the end of a full year without misconduct, an individual may request to be reinstated on Bonus Visiting through the Sub-Classification Committee.

In the future, new men placed in the population of the Penitentiary Unit will automatically be placed on the Bonus Visiting and will receive three (3) visits per month as long as each man maintains a clean institutional record.

/S/ Maurice H. Sigler
Maurice H. Sigler, Warden

## APPENDIX L

83–185. Chief executive officer; responsibilities; duties. (1) The chief executive officer of each facility shall be responsible for the discipline of those persons committed to the Division of Corrections who reside therein. No person shall be punished except upon the order of the chief executive officer of the facility; nor shall any punishment be imposed otherwise than in accordance with this section.

(2) Except in flagrant or serious cases, punishment for misconduct shall consist of deprivation of privileges. In cases of assault, escape, attempt to escape or other flagrant or serious misconduct, the chief executive officer may order that a person's reduction of term as provided in section 83–1,107 be forfeited or withheld and also that the person be confined in a disciplinary cell. The chief executive officer may order that such person, during all or part of the period in a disciplinary cell, be put on an adequate and healthful diet. A person in a disciplinary cell shall be visited at least once every eight hours. No cruel, inhuman or corporal punishment shall be used on any person.

(3) The chief executive officer shall maintain a record of breaches of discipline, of the disposition of each case, and of the punishment, if any, for each such breach. Each breach of discipline shall be entered in the person's file, together with the disposition or punishment therefor.

(4) The chief executive officer may recommend to the Director of Corrections that a person who is considered to be incorrigible by reason of frequent intentional breaches of discipline, or who is detrimental to the discipline or the morale of the facility, be transferred to another facility for stricter safekeeping and closer confinement, subject to the provisions of section 83–176.

### APPENDIX M

83–1,107.  Chief executive officer; reduction of sentence; provisions.  (1) The chief executive officer of a facility shall reduce for good behavior and faithful performance of duties while confined in a facility the term of a committed offender sentenced as follows: Two months on the first year, two months on the second year, three months on the third year, four months for each succeeding year of his term and pro rata for any part thereof which is less than a year. In addition, for especially meritorious behavior or exceptional performance of his duties, an offender may receive a further reduction, not to exceed five days, for any month of imprisonment.  The total of all such reductions shall be deducted:

(a) From his minimum term, to determine the date of his eligibility for release on parole;  and

(b) From his maximum term, to determine the date when his release under supervision becomes mandatory under the provisions of section 83–1,111.

(2) Reductions of such terms may be forfeited, withheld and restored by the chief executive officer of the facility after the offender has been consulted regarding the charges of misconduct.  No reduction of an offender's term shall be forfeited or withheld after an offender is released on parole.

### APPENDIX N

83–1,109.  Chief executive officer; reduction of sentence; report; Director of Corrections; duties.  The chief executive officer of a facility shall regularly report all reductions of prison terms for good behavior and faithful performance of duties and for especially meritorious behavior or exceptional performance of duties, and all forfeitures and restorations of such reductions to the Director of Corrections.  On the basis of such report, the director shall inform the Board of Parole and the Parole Administrator of all committed offenders who are expected to become eligible for release on parole or whose release on parole will become mandatory within the next three months.

### APPENDIX O

### RECORDS OFFICE

The Records Office is important to you inasmuch as here is where your official time is calculated and recorded.  As well, any reference

to detainers and your personal property file are maintained in this department. Any questions should be directed to the Records Officer.

The following is the amount of statutory time you receive on a sentence:

For the 1st yr. you are allowed 2 months statutory time;
for the 2nd yr., you are allowed 2 months statutory time;
for the 3rd yr., you are allowed 3 months statutory time;
for the 4th yr. and every year thereafter, you are allowed 4 months statutory time per year.

*Extra-Earned Good Time*

You will receive five (5) days a month for receiving average or above average work reports. A poor work report will result in your not receiving this work good time.

*Blood Time*

Anyone who donates blood to the American Red Cross receives good time credits for their donations. Anyone under the age of 18 must have the Warden's approval. Those over 18 may voluntarily give blood on the following scheduled months: MAY, AUGUST and DECEMBER. The Red Cross Bloodmobile unit is generally scheduled for the first full week of the months mentioned above.

You will reduce from your sentence, via the Board of Parole approval, five days for the first donation, ten days for the second donation, and fifteen day for every donation thereafter.

Should you receive a disciplinary report or below average work report any time between donations, you will be credited only five days the next time you donate blood to the Red Cross as a result of the disciplinary action.

## APPENDIX P

## THE CUSTODIAL DEPARTMENT

The Captain, Lieutenants, Sergeants and Correctional Officers are under the direct supervision of the Associate Warden—Custody, and help maintain discipline within the penal complex. They are charged with your supervision in all matters such as count, conduct, job assignment and recreation. You must follow their instructions.

The Correctional Officers and all other personnel within the penal complex are employed and trained to carry out the policies approved by the Administrative Staff. They will help you in any reasonable way if you show that you are interested in being helped. They are, however, empowered and required to take any and all actions they deem necessary to do their duties as required by existing laws, whether or not such action may be an infringement upon any implied privilege or directly contrary to any of the rules and regulations—wanton cruelty is an exception.

## LIVING QUARTERS & PERSONAL HYGIENE

Your living quarters are your home. Because of the large number of men who will be in this housing area, sanitation and cleanliness and good conduct are of utmost importance. It is your responsibility,

therefore, to assist by using good common sense and respect for the other man.

For your benefit, the following rules and regulations are listed to help you make this stay in the complex serve you.

There are several official counts each day. When count is being conducted in your living quarters, you are required to stand at the door of your cell and be counted during daytime counts. Do not speak to the officer while he is making the count. When there are counts at night after you retire, some portion of your body must be visible to the officer making the count (skin must be showing).

Your bed will be made neatly and your living area clean before going to work each day. Basin, toilet bowl, floor and bars will be cleaned daily and scuff marks removed from the walls. The contents of your living area must be arranged as instructed. Living quarters must be ready for inspection at all times.

Always remember that YOU are responsible for the articles found in your area.

The only items or furniture permitted in your living quarters are those furnished by the complex, items (within prescribed limits) purchased through the stores and approved items sent in from outside sources.

All empty medicine bottles and containers are contraband and must be turned over to the officer in charge of your living quarters.

Because of sanitation, fire or other objectionable hazards, you are not allowed to keep magazines, paper back books, newspapers and other collectable items such as clippings, in your quarters after the expiration date of the items.

Personal letters must be destroyed after 30 days as shown by the inspector's stamp.

You may not scratch, mark, or otherwise deface the walls or fixtures of your living quarters. Do not tamper with windows, door locks, electric light fixtures, radio headphones, nor hang pictures or other articles on the walls, nor in any manner impair a neat, orderly appearance of your quarters.

Other than on flag galleries (bottom floors of cell houses) curtains are not permitted. They must be regulation size and issue.

Smoking in bed is against the law.

You are not permitted to lay in your bed with your shoes on.

Entering any living quarters other than those to which you are assigned, without specific permission by officials, is forbidden.

You are expressly forbidden to sleep, lounge or loiter upon another offender's bed at any time. Nor can you loiter around or in another offender's living quarters.

When you are living in a cell house, you must go directly to your cell. You may talk with your living quarter mate until it is time for lights out. At this time you are to undress immediately and retire.

Unnecessary disturbances, rowdiness, and boisterous conduct of any nature is strictly forbidden.

*Personal Cleanliness*

You are required to shower twice a week, but encouraged to shower daily, at the prescribed time. Five (5) minutes is allowed to shower.

It is a must that you present a clean and neat appearance at all times, work permitting, with pockets buttoned, shirt buttoned except for the collar button, shoes clean and hair neatly trimmed and combed. Regulation haircuts will be no longer than one-quarter inch for the first inch above the ears. Hair on top of the head will not exceed three (3) inches in length.

You are required to have a haircut every two weeks. No sideburns, mustaches, or beards are permitted at any time. Hair will be neatly tapered-cut in the back, and not squared or duck-tailed at any time.

You must be clean shaven at all times.

You are issued the following toilet articles: 1 shaving soap; 1 hand soap; 1 shaving brush; 3 razor blades. When you use what you have, you may draw more by asking the officer in charge of your living area, or at regular issue.

Upon your assignment to a living area you are issued all the clothing and equipment required for your use. You are responsible for all items issued to you. Do not alter, damage or dispose of your clothing or equipment in any manner or for any reason. When it becomes unserviceable, turn it in to the officer for exchange.

All wearing apparel, including civilian shoes, must be marked with your number.

The clothing and linen issued to you is listed below in the maximum amount you should have on your person or in your living quarters. Having more than the listed amount will result in disciplinary action.

a. Two (2) blue shirts
b. Two (2) blue pants
c. Two (2) pair of shorts
d. Two (2) blankets
e. Two (2) sheets
f. Two (2) towels
g. One (1) white shirt; for group activities—visit (unless assigned to job where white clothes are mandatory)
h. One (1) blue jacket (not to be sent in with laundry)
i. One (1) handkerchief
j. One (1) pair of socks
k. One (1) T-shirt
*l.* One (1) pillow case
m. Two (2) long underwear (in season)
n. One (1) cap (according to season)

Anytime a coat is worn, at least two of the buttons must be buttoned (from the bottom of coat) except while you are participating in recreational activities. All but the top button of your shirt must be buttoned at all times. Shirt sleeves may be neatly rolled (but not above the elbow.)

The items listed below are laundered daily and must be exchanged daily at shower time or on an emergency basis:

1. T-shirts
2. Handkerchiefs
3. Socks
4. Towels

Shirts, pants, shorts, are laundered TWICE A WEEK. Bedding is laundered once a week. All RDC laundry is laundered once a week.

All offenders with job assignments in the hospital, dental department, all kitchens, dining rooms, barber shops, butcher shop, front entrance store, milk processing, will be issued seven (7) sets of white clothing to wear on the job. White hats are issued on the job.

Gloves are issued for various assigned jobs and must remain in that area at each concluding work day.

Gloves for personal wear can be purchased from the store.

Straw hats are issued to those individuals assigned to utility details and farm work where there is a need in the summer only.

Hooded sweat shirts are issued and can only be in the possession of those men working outside in the cold continuously.

Athletic & Recreation sweat shirts and jerseys are for sports activities only.

Any unauthorized item found in your living quarters will be considered contraband.

## CONTRABAND

Contraband is any item that is not purchased by you at the store, issued to you by the state, or stamped and approved by complex officials. Items received by trade or barter are contraband. Possession of contraband will result in disciplinary action. Regular search of your person and quarters is established routine.

## GENERAL RULES

Any inmate who escapes or attempts to escape, or takes part either actively or passively in a mutiny, riot, or insurrection, will be severely punished and is subject to trial in State courts.

The making of false, malicious, or vicious statements about any official, or supervisor of any inmate is strictly forbidden.

Paying a bribe for any service rendered by other inmates is forbidden.

The preparation or use of any beverage other than those normally served during meals or specially approved at other times, is prohibited.

The preparation or use of any item or substance for smoking or chewing, other than approved foodstuffs, confections, and tobacco items, is strictly forbidden.

Reference to another inmate, either in writing or orally, by any other than his correct name, or commonly used name in good taste, is forbidden. This means derogatory names such as "Burglar", "Paper Hanger", etc., will not be used by anyone when referring to another individual or to themselves.

You shall address all officers and staff members by their title; for example: Officer, Mr., Dr., Lieutenant, or Sir. Never address an officer or official by his first or last name only.

Colored glasses unless prescribed by the doctor, will be worn only out of doors.

Mutilation of your physical body in any manner is prohibited. This includes tattooing, self-inflicted injuries, or self-performed surgical procedures of any and all types.

Possession of any negotiable item, such as stamps or monies in any form, is prohibited.

In the event of any emergency such as an accident, fire, or failure of facilities, you must conduct yourself according to currently established procedure, and not impede, crowd, nor hamper corrective action. This means you must not leave your assigned post other than to give normal required assistance or to report a situation, unless ordered to do so by proper authority, or to evacuate according to established procedure.

You must not at any time deliberately attempt to conceal yourself or your actions, or any other offender or his actions, from observation of the officer in charge, or from an established observation post.

## APPENDIX Q

### Nebraska Penal and Correctional Complex

#### Penitentiary Unit

General
Policy and Procedure

Inmate Control
Misconduct
and
The Adjustment Committee

April 1, 1971

*Policy:* In the interest of treatment-oriented discipline, it is necessary that inmates and staff members maintain high standards of behavior, courtesy and personal conduct. It is the policy of this institution, in administering discipline, to gain voluntary acceptance of certain limitations by the inmate body. Discipline must be realistically administered in order to maintain the general welfare of the institution community and conformance to specified standards and regulations, while at the same time implementing treatment of the offender.

*Purpose:* To set forth the institutional policy and procedures for the administration of discipline to insure that disciplinary processes are carried out as an integral part of the total treatment program, and to establish professional standards for all employees in fulfilling this responsibility.

*Standards of Conduct.* The institution population will be kept informed through the orientation process and by written orders and memorandums as to the standards of conduct expected. When it becomes necessary to regulate and control a man's conformance to the prescribed standards, disciplinary measures consistent with treatment of the individual will be applied in appropriate degree and in an impersonal, impartial manner.

*Misconduct.*

   a.   Major Misconduct: Major misconduct is a serious violation and will be reported formally to the Adjustment Committee on the Misconduct Report Form and/or detailed narrative.

b. Minor Misconduct: Minor misconduct is a less serious violation which may be resolved immediately and informally by the inmate's supervisor or formally reported on the Misconduct Report Form. Repeated minor misconduct should be formally reported.

*Misconduct Reports:*

a. Preparation: In reporting misconduct on the Misconduct Report Form, the report should be prepared carefully and accurately so as to describe events exactly as they happen. The accurate preparation of a Misconduct Report is a major contributing factor in accurate evaluation of the misconduct by the Adjustment Committee. The initial statement on the report should be a brief statement of the charge or charges, followed by a detailed report of the incident. Articles of evidence should always accompany the report.

b. Processing of Misconduct Reports: Completed Misconduct Reports along with any articles of evidence, should be forwarded to the Chief Correction Supervisor's office for investigation. The Shift Lieutenant will conduct an investigation, note his findings, and submit to the Chief Corrections Supervisor. The Chief Corrections Supervisor will review the report, conduct additional investigation if necessary, interview the Shift Lieutenant and officer submitting report, and verify the accuracy, proper preparation of the report and assemble all information and articles regarding the misconduct report. Upon completion of this investigation, all information will be noted on the space provided on the Misconduct Report, then submitted to the Chairman of the Adjustment Committee so the case may be promptly scheduled for a committee hearing.

*Administration of Discipline:* The administration of discipline is hereby delegated as follows:

a. All employees will resolve immediately and informally minor violations by any inmate under their observation and/or supervision.

b. The Chief Corrections Supervisor will initiate prompt investigation on all misconduct reports and will maintain control of any adverse situation and its inmate participants.

c. Adjustment Committee will receive reports of misconduct, conduct hearings, and make findings and impose disciplinary actions.

*The Adjustment Committee:*

a. Organization: The Adjustment Committee is composed as follows: Associate Warden Custody, Chairman; Correctional Industries Superintendent, Member; Reception Center Director, Member.

Note: The Adjustment Committee is responsible for the preparation of meeting agenda, recording, distribution, and filing of all reports as necessary for institution requirements. Further, the committee will answer directly to the Administrative Assistant on matters of discipline, adjustment, and investigations conducted relative to the daily processing of Misconduct Reports.

b. Committee Functions:

(1) The Adjustment Committee will meet daily at 8:00 a. m. in the office of the Associate Warden Custody and/or the Adjustment Center, as required.

(2) The Committee will review and evaluate all misconduct reports as to the underlying causes for the adverse behavior and will carefully consider all possible courses of action before reaching a decision. Disciplinary action in all cases will be treatment oriented.

(3) The Committee is authorized to conduct investigations, make findings, impose disciplinary actions, refer cases for further diagnosis, recommend program changes and take any other actions deemed necessary to insure decision effectiveness.

(4) The Committee will concern itself with institution policies and procedures which effect discipline, strive to maintain consistence in its actions, and continually evaluate the effectiveness of its decisions by appropriate follow-up.

(5) The Committee will maintain accurate records and assure the prompt and proper completion of all required reports and forms.

(6) The Committee will review each week or more often, the progress of all inmates housed in the Adjustment Center and initiate or recommend program changes when indicated. The Committee will document all actions, reviews, and program changes so as to provide the Classification Committee with a clear, concise picture of individual inmate adjustment.

*Adjustment Committee Actions:*

a. General Principles:

(1) The decisions and recommendations of the Committee will be the result of group consensus and judgment.

(2) Full consideration must be given to the causes for the adverse behavior, the setting and circumstances in which it occurred, the man's accountability, and the correctional treatment goals.

(3) Disciplinary measures will be taken only at such times and to such degrees as are necessary to regulate and control a man's behavior within acceptable limits and will never be rendered capriciously or in the nature of retaliation or revenge.

(4) Action will be taken as soon after the occurrence as circumstances permit.

(5) Work assignments and program changes will not be used as disciplinary measures.

(6) The use of corporal punishment is strictly prohibited.

(7) Disciplinary action taken and recommended may include but not necessarily be limited to the following: reprimand, restrictions of various kinds, extra duty, confinement in the Adjustment Center, withholding of statutory good time and/or extra earned good time, or a combination of the elements listed herein.

*Use of Segregation:* Inmates may be placed in segregation for any one of the following reasons, and documentation on either the Misconduct Report Form or in narrative must be sent to the Associate Warden Custody in each case.

    a. To insure immediate control and supervision.

    b. To protect potential victims.

    c. To insure witnesses against intimidation.

    d. As a punishment for some major institutional infraction.

    e. To control those whose violent emotions are out of control.

f. To insure their safety or the safety of others.

g. To insure the safety and security of the institution.

h. Demonstrated defiance of personnel acting in the line of duty.

i. Willful refusal to obey orders.

Note: Inmates awaiting action of the Adjustment Committee will not routinely be placed in the Adjustment Center unless one or more of the above reasons are evident.

No man should remain in the Adjustment Center longer than necessary, and special care must be taken to insure that this unit does not become a haven for those who persistently fail to solve their problems.

The Adjustment Committee will conduct a review each week or more often, of all cases in the Adjustment Center in discipline, to consider possible treatment alternatives.

In addition to this, the institution counselor will maintain a progress file on long-term confinement cases. The Counselor has the responsibility to maintain contact with those inmates who are housed in segregation and report their progress or lack of progress to the Adjustment Committee. These progress reports are prepared at the end of each month and are used as a tool in determining further action by the Adjustment Committee.

Maurice H. Sigler, Warden.