## BOUNDS, CORRECTION COMMISSIONER, ET AL. *v.* SMITH ET AL.

No. 75–915.   Argued November 1, 1976—Decided April 27, 1977

MARSHALL, J., delivered the opinion of the Court, in which BRENNAN, WHITE, BLACKMUN, POWELL, and STEVENS, JJ., joined. POWELL, J., filed a concurring opinion, *post,* p. 833. BURGER, C. J., filed a dissenting opinion, *post,* p. 833. STEWART, J., *post,* p. 836, and REHNQUIST, J., *post,* p. 837, filed dissenting opinions, in which BURGER, C. J., joined.

*Jacob L. Safron,* Special Deputy Attorney General of North Carolina, argued the cause for petitioners. With him on the brief was *Rufus L. Edmisten,* Attorney General.

*Barry Nakell,* by appointment of the Court, 425 U. S. 968, argued the cause and filed a brief for respondents.*

MR. JUSTICE MARSHALL delivered the opinion of the Court.

The issue in this case is whether States must protect the right of prisoners to access to the courts by providing them with law libraries or alternative sources of legal knowledge. In *Younger* v. *Gilmore,* 404 U. S. 15 (1971), we held *per curiam* that such services are constitutionally mandated. Petitioners, officials of the State of North Carolina, ask us

---

*\*Andrew P. Miller,* Attorney General, and *Alan Katz,* Assistant Attorney General, filed a brief for the Commonwealth of Virginia as *amicus curiae* urging reversal.

to overrule that recent case, but for reasons explained below, we decline the invitation and reaffirm our previous decision.

I

Respondents are inmates incarcerated in correctional facilities of the Division of Prisons of the North Carolina Department of Correction. They filed three separate actions under 42 U. S. C. § 1983, all eventually consolidated in the District Court for the Eastern District of North Carolina. Respondents alleged, in pertinent part, that they were denied access to the courts in violation of their Fourteenth Amendment rights by the State's failure to provide legal research facilities.[1]

The District Court granted respondents' motion for summary judgment on this claim,[2] finding that the sole prison library in the State was "severely inadequate" and that there was no other legal assistance available to inmates. It held on the basis of *Younger* v. *Gilmore* that respondents' rights to access to the courts and equal protection of the laws had been violated because there was "no indication of any assistance at the initial stage of preparation of writs and petitions." The court recognized, however, that determining the "appropriate relief to be ordered . . . presents a difficult problem," in view of North Carolina's decentralized prison system.[3] Rather than attempting "to dictate precisely what course the State should follow," the court "charge[d] the Depart-

---

[1] The complaints also alleged a number of other constitutional violations not relevant to the issue now before us.

[2] The District Court had originally granted summary judgment for the state officials in one of the three consolidated actions. On appeal, the Court of Appeals for the Fourth Circuit appointed counsel and remanded that case with the suggestion that it be consolidated with the other two cases, then still pending in the District Court.

[3] North Carolina's 13,000 inmates are housed in 77 prison units located in 67 counties. Sixty-five of these units hold fewer than 200 inmates. Brief for Petitioners 7 n. 3.

ment of Correction with the task of devising a Constitutionally sound program" to assure inmate access to the courts. It left to the State the choice of what alternative would "most easily and economically" fulfill this duty, suggesting that a program to make available lawyers, law students, or public defenders might serve the purpose at least as well as the provision of law libraries. Supp. App. 12–13.

The State responded by proposing the establishment of seven libraries in institutions located across the State chosen so as to serve best all prison units. In addition, the State planned to set up smaller libraries in the Central Prison segregation unit and the Women's Prison. Under the plan, inmates desiring to use a library would request appointments. They would be given transportation and housing, if necessary, for a full day's library work. In addition to its collection of lawbooks,[4] each library would stock legal forms and writing paper and have typewriters and use of copying machines. The State proposed to train inmates as research assistants and typists to aid fellow prisoners. It was estimated that ultimately some 350 inmates per week could use the libraries, although inmates not facing court deadlines might have to wait three or four weeks for their turn at a library. Respond-

---

[4] The State proposed inclusion of the following lawbooks:
North Carolina General Statutes
North Carolina Reports (1960–present)
North Carolina Court of Appeals Reports
Strong's North Carolina Index
North Carolina Rules of Court
United States Code Annotated:
  Title 18
  Title 28 §§ 2241–2254
  Title 28 Rules of Appellate Procedure
  Title 28 Rules of Civil Procedure
  Title 42 §§ 1891–2010
Supreme Court Reporter (1960–present)
Federal 2d Reporter (1960–present)

ents protested that the plan was totally inadequate and sought establishment of a library at every prison.[5]

The District Court rejected respondents' objections, finding the State's plan "both economically feasible and practicable," and one that, fairly and efficiently run, would "insure each inmate the time to prepare his petitions."[6] *Id.*, at 19. Further briefing was ordered on whether the State was required to provide independent legal advisors for inmates in addition to the library facilities.

In its final decision, the District Court held that petitioners were not constitutionally required to provide legal assistance as well as libraries. It found that the library plan was suf-

---

Federal Supplement (1960–present)
Black's Law Dictionary
Sokol: Federal Habeas Corpus
LaFave and Scott: Criminal Law Hornbook (2 copies)
Cohen: Legal Research
Criminal Law Reporter
Palmer: Constitutional Rights of Prisoners

This proposal adheres to a list approved as the minimum collection for prison law libraries by the American Correctional Association (ACA), American Bar Association (ABA), and the American Association of Law Libraries, except for the questionable omission of several treatises, Shepard's Citations, and local rules of court. See ACA, Guidelines for Legal Reference Service in Correctional Institutions: A Tool for Correctional Administrators 5–9 (2d ed. 1975) (hereafter ACA Guidelines); ABA Commission on Correctional Facilities and Services, Bar Association Support to Improve Correctional Services (BASICS), Offender Legal Services 29–30, 70–78 (rev. ed. 1976).

[5] Respondents also contended that the libraries should contain additional legal materials, and they urged creation of a large central circulating library.

[6] The District Court did order two changes in the plan: that extra copies of the U. S. C. A. Habeas Corpus and Civil Rights Act volumes be provided, and that no reporter advance sheets be discarded, so that the libraries would slowly build up duplicate sets. But the court found that most of the prison units were too small to require their own libraries, and that the cost of the additional books proposed by respondents would surpass their usefulness.

ficient to give inmates reasonable access to the courts and that our decision in *Ross* v. *Moffitt,* 417 U. S. 600 (1974), while not directly in point, supported the State's claim that it need not furnish attorneys to bring habeas corpus and civil rights actions for prisoners.

After the District Court approved the library plan, the State submitted an application to the Federal Law Enforcement Assistance Administration (LEAA) for a grant to cover 90% of the cost of setting up the libraries and training a librarian and inmate clerks. The State represented to LEAA that the library project would benefit all inmates in the State by giving them "meaningful and effective access to the court[s]. . . . [T]he ultimate result . . . should be a diminution in the number of groundless petitions and complaints filed . . . . The inmate himself will be able to determine to a greater extent whether or not his rights have been violated" and judicial evaluation of the petitions will be facilitated. Brief for Respondents 3a.

Both sides appealed from those portions of the District Court orders adverse to them. The Court of Appeals for the Fourth Circuit affirmed in all respects save one. It found that the library plan denied women prisoners the same access rights as men to research facilities. Since there was no justification for this discrimination, the Court of Appeals ordered it eliminated. The State petitioned for review and we granted certiorari. 425 U. S. 910 (1976).[7] We affirm.

## II

A. It is now established beyond doubt that prisoners have a constitutional right of access to the courts. This Court recognized that right more than 35 years ago when it struck down a regulation prohibiting state prisoners from filing petitions for habeas corpus unless they were found " 'properly

---

[7] Respondents filed no cross-appeal and do not now question the library plan, nor do petitioners challenge the sex discrimination ruling.

drawn'" by the "'legal investigator'" for the parole board. *Ex parte Hull,* 312 U. S. 546 (1941). We held this violated the principle that "the state and its officers may not abridge or impair petitioner's right to apply to a federal court for a writ of habeas corpus." *Id.,* at 549. See also *Cochran* v. *Kansas,* 316 U. S. 255 (1942).

More recent decisions have struck down restrictions and required remedial measures to insure that inmate access to the courts is adequate, effective, and meaningful. Thus, in order to prevent "effectively foreclosed access," indigent prisoners must be allowed to file appeals and habeas corpus petitions without payment of docket fees. *Burns* v. *Ohio,* 360 U. S. 252, 257 (1959); *Smith* v. *Bennett,* 365 U. S. 708 (1961). Because we recognized that "adequate and effective appellate review" is impossible without a trial transcript or adequate substitute, we held that States must provide trial records to inmates unable to buy them. *Griffin* v. *Illinois,* 351 U. S. 12, 20 (1956).[8] Similarly, counsel must be ap-

---

[8] See also *Eskridge* v. *Washington Prison Bd.,* 357 U. S. 214 (1958) (provision of trial transcript may not be conditioned on approval of judge); *Draper* v. *Washington,* 372 U. S. 487 (1963) (same); *Lane* v. *Brown,* 372 U. S. 477 (1963) (public defender's approval may not be required to obtain *coram nobis* transcript); *Rinaldi* v. *Yeager,* 384 U. S. 305 (1966) (unconstitutional to require reimbursement for cost of trial transcript only from unsuccessful imprisoned defendants); *Long* v. *District Court of Iowa,* 385 U. S. 192 (1966) (State must provide transcript of post-conviction proceeding); *Roberts* v. *LaVallee,* 389 U. S. 40 (1967) (State must provide preliminary hearing transcript); *Gardner* v. *California,* 393 U. S. 367 (1969) (State must provide habeas corpus transcript); *Williams* v. *Oklahoma City,* 395 U. S. 458 (1969) (State must provide transcript of petty-offense trial); *Mayer* v. *Chicago,* 404 U. S. 189 (1971) (State must provide transcript of nonfelony trial).

The only cases that have rejected indigent defendants' claims to transcripts have done so either because an adequate alternative was available but not used, *Britt* v. *North Carolina,* 404 U. S. 226 (1971), or because the request was plainly frivolous and a prior opportunity to obtain a transcript was waived, *United States* v. *MacCollom,* 426 U. S. 317 (1976).

pointed to give indigent inmates "a meaningful appeal" from their convictions. *Douglas* v. *California*, 372 U. S. 353, 358 (1963).

Essentially the same standards of access were applied in *Johnson* v. *Avery*, 393 U. S. 483 (1969), which struck down a regulation prohibiting prisoners from assisting each other with habeas corpus applications and other legal matters. Since inmates had no alternative form of legal assistance available to them, we reasoned that this ban on jailhouse lawyers effectively prevented prisoners who were "unable themselves, with reasonable adequacy, to prepare their petitions," from challenging the legality of their confinements. *Id.,* at 489. *Johnson* was unanimously extended to cover assistance in civil rights actions in *Wolff* v. *McDonnell,* 418 U. S. 539, 577–580 (1974). And even as it rejected a claim that indigent defendants have a constitutional right to appointed counsel for discretionary appeals, the Court reaffirmed that States must "assure the indigent defendant an adequate opportunity to present his claims fairly." *Ross* v. *Moffitt,* 417 U. S., at 616. "[M]eaningful access" to the courts is the touchstone. See *id.,* at 611, 612, 615.[9]

Petitioners contend, however, that this constitutional duty merely obliges States to allow inmate "writ writers" to function. They argue that under *Johnson* v. *Avery, supra,* as long as inmate communications on legal problems are not restricted, there is no further obligation to expend state funds to implement affirmatively the right of access. This argument misreads the cases.

In *Johnson* and *Wolff* v. *McDonnell, supra,* the issue was whether the access rights of ignorant and illiterate inmates were violated without adequate justification. Since these inmates were unable to present their own claims in writing to the courts, we held that their "constitutional right to help,"

[9] The same standards were applied in *United States* v. *MacCollom, supra.*

*Johnson* v. *Avery, supra,* at 502 (WHITE, J., dissenting), required at least allowing assistance from their literate fellows. But in so holding, we did not attempt to set forth the full breadth of the right of access. In *McDonnell,* for example, there was already an adequate law library in the prison.[10] The case was thus decided against a backdrop of availability of legal information to those inmates capable of using it. And in *Johnson,* although the petitioner originally requested law-books, see 393 U. S., at 484, the Court did not reach the question, as it invalidated the regulation because of its effect on illiterate inmates. Neither case considered the question we face today and neither is inconsistent with requiring additional measures to assure meaningful access to inmates able to present their own cases.[11]

Moreover, our decisions have consistently required States to shoulder affirmative obligations to assure all prisoners meaningful access to the courts. It is indisputable that indigent inmates must be provided at state expense with paper and pen to draft legal documents, with notarial services to

---

[10] The plaintiffs stipulated in the District Court to the general adequacy of the library, see *McDonnell* v. *Wolff,* 342 F. Supp. 616, 618, 629–630 (Neb. 1972), although they contested certain limitations on its use. Those claims were resolved by the lower courts. See *id.,* at 619–622; 483 F. 2d 1059, 1066 (CA8 1973); 418 U. S., at 543 n. 2.

[11] Indeed, our decision is supported by the holding in *Procunier* v. *Martinez,* 416 U. S. 396 (1974), in a related right-of-access context. There the Court invalidated a California regulation barring law students and paraprofessionals employed by lawyers representing prisoners from seeing inmate clients. *Id.,* at 419–422. We did so even though California has prison law libraries and permits inmate legal assistance, *Gilmore* v. *Lynch,* 319 F. Supp. 105, 107 n. 1 (ND Cal. 1970), aff'd *sub nom. Younger* v. *Gilmore,* 404 U. S. 15 (1971). Even more significantly, the prisoners in question were actually represented by lawyers. Thus, despite the challenged regulation, the inmates were receiving more legal assistance than prisoners aided only by writ writers. Nevertheless, we found that the regulation "impermissibly burdened the right of access." 416 U. S., at 421.

authenticate them, and with stamps to mail them. States must forgo collection of docket fees otherwise payable to the treasury and expend funds for transcripts. State expenditures are necessary to pay lawyers for indigent defendants at trial, *Gideon* v. *Wainwright*, 372 U. S. 335 (1963); *Argersinger* v. *Hamlin*, 407 U. S. 25 (1972), and in appeals as of right, *Douglas* v. *California, supra.*[12] This is not to say that economic factors may not be considered, for example, in choosing the methods used to provide meaningful access. But the cost of protecting a constitutional right cannot justify its total denial. Thus, neither the availability of jailhouse lawyers nor the necessity for affirmative state action is dispositive of respondents' claims. The inquiry is rather whether law libraries or other forms of legal assistance are needed to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.

B. Although it is essentially true, as petitioners argue,[13] that a habeas corpus petition or civil rights complaint need only set forth facts giving rise to the cause of action, but see, Fed. Rules Civ. Proc. 8 (a)(1), (3), it hardly follows that a law library or other legal assistance is not essential to frame such documents. It would verge on incompetence for a lawyer to file an initial pleading without researching such issues as jurisdiction, venue, standing, exhaustion of remedies, proper parties plaintiff and defendant, and types of relief available. Most importantly, of course, a lawyer must know what the law is in order to determine whether a colorable claim exists, and if so, what facts are necessary to state a cause of action.

If a lawyer must perform such preliminary research, it is

---

[12] Cf. *Estelle* v. *Gamble*, 429 U. S. 97 (1976), holding that States must treat prisoners' serious medical needs, a constitutional duty obviously requiring outlays for personnel and facilities.

[13] Brief for Petitioners 16–17; Tr. of Oral Arg. 3–9, 11–12.

no less vital for a *pro se* prisoner.[14] Indeed, despite the "less stringent standards" by which a *pro se* pleading is judged, *Haines* v. *Kerner,* 404 U. S. 519, 520 (1972), it is often more important that a prisoner complaint set forth a nonfrivolous claim meeting all procedural prerequisites, since the court may pass on the complaint's sufficiency before allowing filing *in forma pauperis* and may dismiss the case if it is deemed frivolous. See 28 U. S. C. § 1915.[15] Moreover, if the State files a response to a *pro se* pleading, it will undoubtedly contain seemingly authoritative citations. Without a library, an inmate will be unable to rebut the State's argument. It is not enough to answer that the court will evaluate the facts pleaded in light of the relevant law. Even the most dedicated trial judges are bound to overlook meritorious cases without the benefit of an adversary presentation. Cf. *Gardner* v. *California,* 393 U. S. 367, 369–370 (1969). In fact, one of the consolidated cases here was initially dismissed by the same judge who later ruled for respondents, possibly because *Younger* v. *Gilmore* was not cited.

We reject the State's claim that inmates are "ill-equipped to use" "the tools of the trade of the legal profession," making libraries useless in assuring meaningful access. Brief for Petitioners 17. In the first place, the claim is inconsistent with the State's representations on its LEAA grant application, *supra,* at 821, and with its argument that access is adequately protected by allowing inmates to help each other with legal problems. More importantly, this Court's experience indicates that *pro se* petitioners are capable of using lawbooks to file cases raising claims that are serious and legitimate even

---

[14] A source of current legal information would be particularly important so that prisoners could learn whether they have claims at all, as where new court decisions might apply retroactively to invalidate convictions.

[15] The propriety of these practices is not before us. Courts may also impose additional burdens before appointing counsel for indigents in civil suits. See *Johnson* v. *Avery,* 393 U. S. 483, 487–488 (1969).

if ultimately unsuccessful. Finally, we note that if petitioners had any doubts about the efficacy of libraries, the District Court's initial decision left them free to choose another means of assuring access.

It is also argued that libraries or other forms of legal assistance are unnecessary to assure meaningful access in light of the Court's decision in *Ross* v. *Moffitt*. That case held that the right of prisoners to "an adequate opportunity to present [their] claims fairly," 417 U. S., at 616, did not require appointment of counsel to file petitions for discretionary review in state courts or in this Court. *Moffitt*'s rationale, however, supports the result we reach here. The decision in *Moffitt* noted that a court addressing a discretionary review petition is not primarily concerned with the correctness of the judgment below. Rather, review is generally granted only if a case raises an issue of significant public interest or jurisprudential importance or conflicts with controlling precedent. *Id.*, at 615–617. *Moffitt* held that *pro se* applicants can present their claims adequately for appellate courts to decide whether these criteria are met because they have already had counsel for their initial appeals as of right. They are thus likely to have appellate briefs previously written on their behalf, trial transcripts, and often intermediate appellate court opinions to use in preparing petitions for further review. *Id.*, at 615.

By contrast in this case, we are concerned in large part with original actions seeking new trials, release from confinement, or vindication of fundamental civil rights. Rather than presenting claims that have been passed on by two courts, they frequently raise heretofore unlitigated issues. As this Court has "constantly emphasized," habeas corpus and civil rights actions are of "fundamental importance . . . in our constitutional scheme" because they directly protect our most valued rights. *Johnson* v. *Avery*, 393 U. S., at 485; *Wolff* v. *McDonnell*, 418 U. S., at 579. While applications for

discretionary review need only apprise an appellate court of a case's possible relevance to the development of the law, the prisoner petitions here are the first line of defense against constitutional violations. The need for new legal research or advice to make a meaningful initial presentation to a trial court in such a case is far greater than is required to file an adequate petition for discretionary review.[16]

We hold, therefore, that the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law.[17]

C. Our holding today is, of course, a reaffirmation of the result reached in *Younger* v. *Gilmore*. While *Gilmore* is not

---

[16] Nor is *United States* v. *MacCollom*, 426 U. S. 317 (1976), inconsistent with our decision. That case held that in a post-conviction proceeding under 28 U. S. C. § 2255, an applicant was not unconstitutionally deprived of access to the courts by denial of a transcript of his original trial pursuant to 28 U. S. C. § 753 (f), where he had failed to take a direct appeal and thereby secure the transcript, where his newly asserted claim of error was frivolous, and where he demonstrated no need for the transcript. Without a library or legal assistance, however, inmates will not have "a *current* opportunity to present [their] claims fairly," 426 U. S., at 329 (BLACKMUN, J., concurring in judgment), and valid claims will undoubtedly be lost.

[17] Since our main concern here is "protecting the ability of an inmate to prepare a petition or complaint," *Wolff* v. *McDonnell*, 418 U. S., at 576, it is irrelevant that North Carolina authorizes the expenditure of funds for appointment of counsel in some state post-conviction proceedings for prisoners whose claims survive initial review by the courts. See N. C. Gen. Stat. § 7A–451 (Supp. 1975); Brief for Petitioners 3 n. 1, 12 n. 8, 14 n. 9, and accompanying text; but cf. *Ross* v. *Moffitt*, 417 U. S. 600, 614 (1974). Moreover, this statute does not cover appointment of counsel in federal habeas corpus or state or federal civil rights actions, all of which are encompassed by the right of access.

Similarly, the State's creation of an advisory Inmate Grievance Commission, see N. C. Gen. Stat. § 148–101 *et seq.* (Supp. 1975); Brief for Petitioners 14, while certainly a noteworthy innovation, does not answer the constitutional requirement for legal assistance to prisoners.

a necessary element in the preceding analysis, its precedential weight strongly reinforces our decision. The substantive question presented in *Gilmore* was: "Does a state have an affirmative federal constitutional duty to furnish prison inmates with extensive law libraries or, alternatively, to provide inmates with professional or quasi-professional legal assistance?" Jurisdictional Statement 5, Brief for Appellants 4, in No. 70–9, O. T. 1971. This Court explicitly decided that question when it affirmed the judgment of the District Court in reliance on *Johnson* v. *Avery*. Cf. this Court's Rule 15 (c). The affirmative answer was given unanimously after full briefing and oral argument. *Gilmore* has been relied upon without question in our subsequent decisions. *Cruz* v. *Hauck,* 404 U. S. 59 (1971) (vacating and remanding for reconsideration in light of *Gilmore* a decision that legal materials need not be furnished to county jail inmates); *Cruz* v. *Beto,* 405 U. S. 319, 321 (1972) (*Gilmore* cited approvingly in support of inmates' right of access to the courts); *Chaffin* v. *Stynchcombe,* 412 U. S. 17, 34 n. 22 (1973) (*Gilmore* cited approvingly as a decision "removing roadblocks and disincentives to appeal"). Most recently, in *Wolff* v. *McDonnell,* despite differences over other issues in the case, the Court unanimously reaffirmed that *Gilmore* requires prison officials "to provide indigent inmates with access to a reasonably adequate law library for preparation of legal actions." 418 U. S., at 578–579.

Experience under the *Gilmore* decision suggests no reason to depart from it. Most States and the Federal Government have made impressive efforts to fulfill *Gilmore*'s mandate by establishing law libraries, prison legal-assistance programs, or combinations of both. See Brief for Respondents, Ex. B. Correctional administrators have supported the programs and acknowledged their value.[18] Resources and support including

---

[18] Nearly 95% of the state corrections commissioners, prison wardens, and treatment directors responding to a national survey supported crea-

substantial funding from LEAA have come from many national organizations.[19]

It should be noted that while adequate law libraries are one constitutionally acceptable method to assure meaningful access to the courts, our decision here, as in *Gilmore,* does not foreclose alternative means to achieve that goal. Nearly

---

tion and expansion of prison legal services. Cardarelli & Finkelstein, Correctional Administrators Assess the Adequacy and Impact of Prison Legal Services Programs in the United States, 65 J. Crim. L., C. & P. S. 91, 99 (1974). Almost 85% believed that the programs would not adversely affect discipline or security or increase hostility toward the institution. Rather, over 80% felt legal services provide a safety valve for inmate grievances, reduce inmate power structures and tensions from unresolved legal problems, and contribute to rehabilitation by pro--iding a positive experience with the legal system. *Id.,* at 95–98. See also ACA Guidelines, *supra,* n. 4; National Sheriffs' Assn., Inmates' Legal Rights, Standard 14, pp. 33–34 (1974); Bluth, Legal Services for Inmates: Coopting the Jailhouse Lawyer, 1 Capital U. L. Rev. 59, 61, 67 (1972); Sigler, A New Partnership in Corrections, 52 Neb. L. Rev. 35, 38 (1972).

[19] See, *e. g.,* U. S. Dept. of Justice, LEAA, A Compendium of Selected Criminal Justice Projects, III–201, IV–361–366 (1975); U. S. Dept. of Justice, LEAA, Grant 75 DF–99–0013, Consortium of States to Furnish Legal Counsel to Prisoners, Final Report, and Program Narrative (1975). The ABA BASICS program, see n. 4, *supra,* makes grants to state and local bar associations for prison legal services and libraries and publishes a complete technical assistance manual, Offender Legal Services (rev. ed. 1976). See also ABA Resource Center on Correctional Law and Legal Services, Providing Legal Services to Prisoners, 8 Ga. L. Rev. 363 (1974). The American Correctional Association publishes Guidelines for Legal Reference Service in Correctional Institutions (2d ed. 1975). The American Association of Law Libraries publishes O. Werner, Manual for Prison Law Libraries (1976), and its members offer assistance to prison law library personnel.

See also ABA Joint Committee on the Legal Status of Prisoners, Standards Relating to the Legal Status of Prisoners, Standards 2.1, 2.2, 2.3 and Commentary, 14 Am. Crim. L. Rev. 377, 420–443 (tent. draft 1977); National Conference of Commissioners on Uniform State Laws, Uniform Corrections Code, § 2–601 (tent. draft 1976); National Advisory Commission on Criminal Justice Standards and Goals, Corrections 26–30, Standards 2.2, 2.3 (1973).

half the States and the District of Columbia provide some degree of professional or quasi-professional legal assistance to prisoners. Brief for Respondents, Ex. B. Such programs take many imaginative forms and may have a number of advantages over libraries alone. Among the alternatives are the training of inmates as paralegal assistants to work under lawyers' supervision, the use of paraprofessionals and law students, either as volunteers or in formal clinical programs, the organization of volunteer attorneys through bar associations or other groups, the hiring of lawyers on a part-time consultant basis, and the use of full-time staff attorneys, working either in new prison legal assistance organizations or as part of public defender or legal services offices.[20] Legal services plans not only result in more efficient and skillful handling of prisoner cases, but also avoid the disciplinary problems associated with writ writers, see *Johnson* v. *Avery*, 393 U. S., at 488; *Procunier* v. *Martinez*, 416 U. S. 396, 421–422 (1974). Independent legal advisors can mediate or resolve administratively many prisoner complaints that would otherwise burden the courts, and can convince inmates that other grievances against the prison or the legal system are ill-founded, thereby facilitating rehabilitation by assuring the inmate that he has not been treated unfairly.[21] It has

---

[20] For example, full-time staff attorneys assisted by law students and a national back-up center were used by the Consortium of States to Furnish Legal Counsel to Prisoners, see n. 19, *supra*. State and local bar associations have established a number of legal services and library programs with support from the ABA BASICS program, see nn. 4 and 19, *supra*. Prisoners' Legal Services of New York plans to use 45 lawyers and legal assistants in seven offices to give comprehensive legal services to all state inmates. Offender Legal Services, *supra*, n. 19, at iv. Other programs are described in Providing Legal Services to Prisoners, *supra*, n. 19, at 399–416.

[21] See Cardarelli & Finkelstein, *supra*, n. 18, at 96–99; LEAA Consortium Reports, *supra*, n. 19; Champagne & Haas, The Impact of Johnson v. Avery on Prison Administration, 43 Tenn. L. Rev. 275, 295–

been estimated that as few as 500 full-time lawyers would be needed to serve the legal needs of the entire national prison population.[22] Nevertheless, a legal access program need not include any particular element we have discussed, and we encourage local experimentation. Any plan, however, must be evaluated as a whole to ascertain its compliance with constitutional standards.[23]

## III

Finally, petitioners urge us to reverse the decision below because federal courts should not "sit as co-administrators of state prisons," Brief for Petitioners 13, and because the District Court "exceeded its powers when it puts [*sic*] itself in the place of the [prison] administrators," *id.*, at 14. While we have recognized that judicial restraint is often appropriate in prisoners' rights cases, we have also repeatedly held that this policy "cannot encompass any failure to take cognizance of valid constitutional claims." *Procunier* v. *Martinez, supra,* at 405.

Petitioners' hyperbolic claim is particularly inappropriate in this case, for the courts below scrupulously respected the limits on their role. The District Court initially held only that petitioners had violated the "fundamental constitutional guarantee," *ibid.*, of access to the courts. It did not thereupon thrust itself into prison administration. Rather, it ordered petitioners themselves to devise a remedy for the violation, strongly suggesting that it would prefer a plan

299 (1976). Cf. 42 U. S. C. § 2996 (4) (1970 ed., Supp. V), in which Congress, establishing the Legal Services Corp., declared that "for many of our citizens, the availability of legal services has reaffirmed faith in our government of laws."

[22] ABA Joint Committee, *supra,* n. 19, at 428–429.

[23] See, *e. g., Stevenson* v. *Reed,* 530 F. 2d 1207 (CA5 1976), aff'g 391 F. Supp. 1375 (ND Miss. 1975); *Bryan* v. *Werner,* 516 F. 2d 233 (CA3 1975); *Gaglie* v. *Ulibarri,* 507 F. 2d 721 (CA9 1974); *Corpus* v. *Estelle,* 409 F. Supp. 1090 (SD Tex. 1975).

providing trained legal advisors. Petitioners chose to establish law libraries, however, and their plan was approved with only minimal changes over the strong objections of respondents. Prison administrators thus exercised wide discretion within the bounds of constitutional requirements in this case.

The judgment is

*Affirmed.*

MR. JUSTICE POWELL, concurring.

The decision today recognizes that a prison inmate has a constitutional right of access to the courts to assert such procedural and substantive rights as may be available to him under state and federal law. It does not purport to pass on the kinds of claims that the Constitution requires state or federal courts to hear. In *Wolff* v. *McDonnell*, 418 U. S. 539, 577–580 (1974), where we extended the right of access recognized in *Johnson* v. *Avery*, 393 U. S. 483 (1969), to civil rights actions arising under the Civil Rights Act of 1871, we did not suggest that the Constitution required such actions to be heard in federal court. And in *Griffin* v. *Illinois*, 351 U. S. 12 (1956), where the Court required the States to provide trial records for indigents on appeal, the plurality and concurring opinions explicitly recognized that the Constitution does not require any appellate review of state convictions. Similarly, the holding here implies nothing as to the constitutionally required scope of review of prisoners' claims in state or federal court.

With this understanding, I join the opinion of the Court.

MR. CHIEF JUSTICE BURGER, dissenting.

I am in general agreement with MR. JUSTICE STEWART and MR. JUSTICE REHNQUIST, and join in their opinions. I write only to emphasize the theoretical and practical difficulties raised by the Court's holding. The Court leaves us unenlightened as to the source of the "right of access to the courts"

which it perceives or of the requirement that States "foot the bill" for assuring such access for prisoners who want to act as legal researchers and brief writers. The holding, in my view, has far-reaching implications which I doubt have been fully analyzed or their consequences adequately assessed.

It should be noted, first, that the access to the courts which these respondents are seeking is not for the purpose of direct appellate review of their criminal convictions. Abundant access for such purposes has been guaranteed by our prior decisions, *e. g., Douglas* v. *California,* 372 U. S. 353 (1963), and *Griffin* v. *Illinois,* 351 U. S. 12 (1956), and by the States independently. Rather, the underlying substantive right here is that of prisoners to mount collateral attacks on their state convictions. The Court is ordering the State to expend resources in support of the federally created right of collateral review.

This would be understandable if the federal right in question were constitutional in nature. For example, the State may be required by the Eighth Amendment to provide its inmates with food, shelter, and medical care, see *Estelle* v. *Gamble,* 429 U. S. 97, 103–104 (1976); similarly, an indigent defendant's right under the Sixth Amendment places upon the State the affirmative duty to provide him with counsel for trials which may result in deprivation of his liberty, *Argersinger* v. *Hamlin,* 407 U. S. 25 (1972); finally, constitutional principles of due process and equal protection form the basis for the requirement that States expend resources in support of a convicted defendant's right to appeal. See *Douglas* v. *California, supra; Griffin* v. *Illinois, supra.*

However, where the federal right in question is of a statutory rather than a constitutional nature, the duty of the State is merely negative; it may not act in such a manner as to interfere with the individual exercise of such federal rights. *E. g., Ex parte Hull,* 312 U. S. 546 (1941) (State may not interfere with prisoner's access to the federal court by screen-

ing petitions directed to the court); *Johnson* v. *Avery,* 393 U. S. 483 (1969) (State may not prohibit prisoners from providing to each other assistance in preparing petitions directed to the federal courts). Prohibiting the State from interfering with federal statutory rights is, however, materially different from requiring it to provide affirmative assistance for their exercise.

It is a novel and doubtful proposition, in my view, that the Federal Government can, by statute, give individuals certain rights and then require the State, as a *constitutional* matter, to fund the means for exercise of those rights. Cf. *National League of Cities* v. *Usery,* 426 U. S. 833 (1976).

As to the substantive right of state prisoners to collaterally attack in federal court their convictions entered by a state court of competent jurisdiction, it is now clear that there is no broad federal *constitutional* right to such collateral attack, see *Stone* v. *Powell,* 428 U. S. 465 (1976); whatever right exists is solely a creation of federal statute, see *Swain* v. *Pressley, ante,* p. 384 (opinion of BURGER, C. J.); *Schneckloth* v. *Bustamonte,* 412 U. S. 218, 250, 252–256 (1973) (POWELL, J., concurring). But absent a federal constitutional right to attack convictions collaterally—and I discern no such right—I can find no basis on which a federal court may require States to fund costly law libraries for prison inmates.* Proper federal-state relations preclude such intervention in the "complex and intractable" problems of prison administration. *Procunier* v. *Martinez,* 416 U. S. 396 (1974).

I can draw only one of two conclusions from the Court's holding: it may be read as implying that the right of prisoners to collaterally attack their convictions is constitutional, rather than statutory, in nature; alternatively, it may be read as

---

*The record reflects that prison officials in no way interfered with inmates' use of their own resources in filing collateral attacks. Prison regulations permit access to inmate "writ writers" and each prisoner is entitled to store reasonable numbers of lawbooks in his cell.

holding that States can be compelled by federal courts to subsidize the exercise of federally created statutory rights. Neither of these novel propositions is sustainable and for the reasons stated I cannot adhere to either view and therefore dissent.

MR. JUSTICE STEWART, with whom THE CHIEF JUSTICE joins, dissenting.

In view of the importance of the writ of habeas corpus in our constitutional scheme, " 'it is fundamental that access of prisoners to the courts for the purpose of presenting their complaints may not be denied or obstructed.' " *Wolff* v. *McDonnell,* 418 U. S. 539, 578, quoting *Johnson* v. *Avery,* 393 U. S. 483, 485. From this basic principle the Court over five years ago made a quantum jump to the conclusion that a State has a constitutional obligation to provide law libraries for prisoners in its custody. *Younger* v. *Gilmore,* 404 U. S. 15.

Today the Court seeks to bridge the gap in analysis that made *Gilmore*'s authority questionable. Despite the Court's valiant efforts, I find its reasoning unpersuasive.

If, as the Court says, there is a constitutional duty upon a State to provide its prisoners with "meaningful access" to the federal courts, that duty is not effectuated by adhering to the unexplained judgment in the *Gilmore* case. More than 20 years of experience with *pro se* habeas corpus petitions as a Member of this Court and as a Circuit Judge have convinced me that "meaningful access" to the federal courts can seldom be realistically advanced by the device of making law libraries available to prison inmates untutored in their use. In the vast majority of cases, access to a law library will, I am convinced, simply result in the filing of pleadings heavily larded with irrelevant legalisms—possessing the veneer but lacking the substance of professional competence.

If, on the other hand, MR. JUSTICE REHNQUIST is correct in his belief that a convict in a state prison pursuant to a

final judgment of a court of competent jurisdiction has no constitutional right of "meaningful access" to the federal courts in order to attack his sentence, then a State can be under no constitutional duty to make that access "meaningful." If the extent of the constitutional duty of a State is simply not to deny or obstruct a prisoner's access to the courts, *Johnson* v. *Avery, supra,* then it cannot have, even arguably, any affirmative constitutional obligation to provide law libraries for its prison inmates.

I respectfully dissent.

MR. JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE joins, dissenting.

The Court's opinion in this case serves the unusual purpose of supplying as good a line of reasoning as is available to support a two-paragraph *per curiam* opinion almost six years ago in *Younger* v. *Gilmore,* 404 U. S. 15 (1971), which made no pretense of containing any reasoning at all. The Court's reasoning today appears to be that we have long held that prisoners have a "right of access" to the courts in order to file petitions for habeas corpus, and that subsequent decisions have expanded this concept into what the Court today describes as a "meaningful right of access." So, we are told, the right of a convicted prisoner to "meaningful access" extends to requiring the State to furnish such prisoners law libraries to aid them in piecing together complaints to be filed in the courts. This analysis places questions of prisoner access on a "slippery slope," and I would reject it because I believe that the early cases upon which the Court relies have a totally different rationale from that which underlies the present holding.

There is nothing in the United States Constitution which requires that a convict serving a term of imprisonment in a state penal institution pursuant to a final judgment of a court of competent jurisdiction have a "right of access" to the federal courts in order to attack his sentence. In the first

case upon which the Court's opinion relies, *Ex parte Hull*, 312 U. S. 546 (1941), the Court held invalid a regulation of the Michigan State prison which provided that " '[a]ll legal documents, briefs, petitions, motions, habeas corpus proceedings and appeals' " which prisoners wish to file in court had to be first submitted to the legal investigator of the state parole board. If the documents were, in the opinion of this official, " 'properly drawn,' " they would be directed to the court designated. Hull was advised that his petition addressed to this Court had been "intercepted" and referred to the legal investigator for the reason that it was "deemed to be inadequate." This Court held that such a regulation was invalid, and said very clearly why:

> "Whether a petition for writ of habeas corpus addressed to a federal court is properly drawn and what allegations it must contain are questions for that court alone to determine." *Id.*, at 549.

A number of succeeding cases have expanded on this barebones holding that an incarcerated prisoner has a right of physical access to a federal court in order to petition that court for relief which Congress has authorized it to grant. These cases, most of which are mentioned in the Court's opinion, begin with *Griffin* v. *Illinois,* 351 U. S. 12 (1956), and culminate in *United States* v. *MacCollom,* 426 U. S. 317 (1976), decided last Term. Some, such as *Griffin, supra,* and *Douglas* v. *California,* 372 U. S. 353 (1963), appear to depend upon the principle that indigent convicts must be given a meaningful opportunity to pursue a state-created right to appeal, even though the pursuit of such a remedy requires that the State must provide a transcript or furnish counsel. Others, such as *Johnson* v. *Avery,* 393 U. S. 483 (1969), *Procunier* v. *Martinez,* 416 U. S. 396 (1974), and *Wolff* v. *McDonnell,* 418 U. S. 539 (1974), depend on the principle that the State, having already incarcerated the convict and thereby virtually eliminated his contact with people outside the prison walls,

may not further limit contacts which would otherwise be permitted simply because such contacts would aid the incarcerated prisoner in preparation of a petition seeking judicial relief from the conditions or terms of his confinement. Clearly neither of these principles supports the Court's present holding: The prisoners here in question have all pursued all avenues of direct appeal available to them from their judgments of conviction, and North Carolina imposes no invidious regulations which allow visits from all persons except those knowledgeable in the law. All North Carolina has done in this case is to decline to expend public funds to make available law libraries to those who are incarcerated within its penitentiaries.

If respondents' constitutional arguments were grounded on the Equal Protection Clause, and were in effect that rich prisoners could employ attorneys who could in turn consult law libraries and prepare petitions for habeas corpus, whereas indigent prisoners could not, they would have superficial appeal. See *Griffin, supra; Douglas, supra.* I believe that they would nonetheless fail under *Ross* v. *Moffitt,* 417 U. S. 600 (1974). There we held that although our earlier cases had required the State to provide meaningful access to state-created judicial remedies for indigents, the only right on direct appeal was that "indigents have an adequate opportunity to present their claims fairly within the adversary system." *Id.,* at 612.

In any event, the Court's opinion today does not appear to proceed upon the guarantee of equal protection of the laws, a guarantee which at least has the merit of being found in the Fourteenth Amendment to the Constitution. It proceeds instead to enunciate a "fundamental constitutional right of access to the courts," *ante,* at 828, which is found nowhere in the Constitution. But if a prisoner incarcerated pursuant to a final judgment of conviction is not prevented from physical access to the federal courts in order that he may file therein petitions for relief which Congress has authorized those courts

to grant, he has been accorded the only constitutional right of access to the courts that our cases have articulated in a reasoned way. *Ex parte Hull, supra.* Respondents here make no additional claims that prison regulations invidiously deny them access to those with knowledge of the law so that such regulations would be inconsistent with *Johnson, supra, Procunier, supra,* and *Wolff, supra.* Since none of these reasons is present here, the "fundamental constitutional right of access to the courts" which the Court announces today is created virtually out of whole cloth with little or no reference to the Constitution from which it is supposed to be derived.

Our decisions have recognized on more than one occasion that lawful imprisonment properly results in a "retraction [of rights] justified by the considerations underlying our penal system." *Price* v. *Johnston,* 334 U. S. 266, 285 (1948); *Pell* v. *Procunier,* 417 U. S. 817, 822 (1974). A convicted prisoner who has exhausted his avenues of direct appeal is no longer to be accorded every presumption of innocence, and his former constitutional liberties may be substantially restricted by the exigencies of the incarceration in which he has been placed. See *Meachum* v. *Fano,* 427 U. S. 215 (1976). Where we come to the point where the prisoner is seeking to collaterally attack a final judgment of conviction, the right of physical access to the federal courts is essential because of the congressional provisions for federal habeas review of state convictions. *Ex parte Hull, supra.* And the furnishing of a transcript to an indigent who makes a showing of probable cause, in order that he may have any realistic chance of asserting his right to such review, was upheld in *United States* v. *MacCollom, supra.* We held in *Ross* v. *Moffitt, supra,* that the *Douglas* holding of a right to counsel on a first direct appeal as of right would not be extended to a discretionary second appeal from an intermediate state appellate court to the state court of last resort, or from the state court of last resort to this Court. It would seem, *a fortiori,* to follow from that case that an

incarcerated prisoner who has pursued all his avenues of direct review would have no constitutional right whatever to state appointed counsel to represent him in a collateral attack on his conviction, and none of our cases has ever suggested that a prisoner would have such a right. See *Johnson* v. *Avery*, 393 U. S., at 488. Yet this is the logical destination of the Court's reasoning today. If "meaningful access" to the courts is to include law libraries, there is no convincing reason why it should not also include lawyers appointed at the expense of the State. Just as a library may assist some inmates in filing papers which contain more than the bare factual allegations of injustice, appointment of counsel would assure that the legal arguments advanced are made with some degree of sophistication.

I do not believe anything in the Constitution requires this result, although state and federal penal institutions might as a matter of policy think it wise to implement such a program. I conclude by indicating the same respect for *Younger* v. *Gilmore*, 404 U. S. 15 (1971), as has the Court, in relegating it to a final section set apart from the body of the Court's reasoning. *Younger* supports the result reached by the Court of Appeals in this case, but it is a two-paragraph opinion which is most notable for the unbridged distance between its premise and its conclusion. The Court's opinion today at least makes a reasoned defense of the result which it reaches, but I am not persuaded by those reasons. Because of that fact I would not have the slightest reluctance to overrule *Younger* and reverse the judgment of the Court of Appeals in this case.