[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
CORRECTED MEMORANDUM OF DECISION
This is a petition for a writ of habeas corpus dated June 12, 1996 containing allegations relating to the petitioner's conditions of confinement while in the custody of the respondent. During the pendency of this matter, the petitioner has filed a motion captioned, "Motion for Legal Books" through which he has raised the issue of access to the courts. This Memorandum relates to the petitioner's motion.
Following the filing of the motion, the court conducted an evidentiary hearing. Based on the evidence adduced at the hearing the court makes the following findings and orders.
The petitioner is an inmate in the custody of the Commissioner of Corrections and presently confined at the Northern Correctional Institute. Inmates in the custody of the Commissioner are given classifications which are based on an assessment of the threat they pose to the safety and security of the staff and inmate population, as well as an inmates' program needs. A Level One classification represents the least risk and a Level Five the greatest. Facilities, too, have classifications. For example, an inmate who carries a Level Two classification may be confined only at an institution classified Level Two or higher. Northern is a Level Five facility, housing inmates who have been classified as representing the greatest safety and security threat in addition to death-sentence inmates.
At Northern, most inmates, including the petitioner, are confined in Administrative Segregation which is an extremely CT Page 5545 restrictive form of confinement. Inmates who are classified in Administrative Segregation generally participate in a Phase Program consisting of three phases. In Phase One, an inmate is confined to his cell with brief periods out of one's cell for recreation. When inmates in Phase One are out of their cells, their movement is restricted. They are placed in handcuffs and leg shackles. They are escorted. While the minimum period of Phase One is generally six months, an inmate may progress from Phase One to Phase Two by remaining discipline free and demonstrating a desire and willingness to progress toward ultimate return to the general inmate population. Phases Two and Three, which generally consists of three months each, represent decreased levels of restriction with more opportunity for structured interaction with staff and other similarly-situated inmates.
The petitioner has been incarcerated for four years. For the past two years, following his assault on a corrections officer, he has been confined at Northern. He remains in Phase One.
The petitioner is twenty five years of age. He completed the ninth grade and has not earned a G.E.D. He is not versed in the law.
The petitioner, who is proceeding pro se in this petition, has no statutory or constitutional right to the appointment of counsel in regard to the claims raised in this petition.
From time to time, the Commissioner issues Administrative Directives which are guidelines for the orderly operation of facilities within the purview of the Commissioner. They also contain rules for inmate conduct. Additionally, there is a facilities handbook for each of the institutions within the Department of Corrections.
Administrative Directive 10.7 pertains to Inmate Communication, and provides, in sum, that there shall be no limit placed on the number of letters an inmate may write or receive at personal expense, and that inmates shall pay for personal mailing expenses, except that an indigent inmate is entitled to five free letters per month addressed to the court or attorneys. The Directive further provides that "Additional free correspondence to courts and attorneys may be authorized by the Unit Administrator based upon the reasonable needs of the inmate." Petitioner's Exhibit 1, A.D. 10.7, 4(C). CT Page 5546
With respect to telephone calls, A.D. 10.7 provides that inmate use of collect-call telephones is a privilege and not a right, and that use of the telephone may be prohibited by the Facility Administrator. The Director further provides that if the call is to an attorney, "such prohibition shall be based upon a determination relating to the maintenance of security, safety or orderly operation of the facility." Id, 5. Additionally, the Directive states that inmates on ". . . Level 5 Units shall be allowed telephone calls on a comparable basis to inmates in general population but limited to those periods when protective custody inmates are allowed out of their cells." Id, 5.B.
With respect to Northern inmates, the Northern facilities handbook provides that inmates in Phase One of Administrative Segregation are entitled to one fifteen minute phone call a week, inmates in Phase Two are entitled to two such calls, and inmates in Phase Three are entitled to three calls a week. cf. Petitioner's Exhibit 2, Northern handbook.
As to privileged calls, that is, non-recorded calls to counsel, the Directive provides that: "Inmates shall be allowed two privileged calls a month in addition to calls initiated by the inmate's attorney." Id., 5.E.
During the hearing, Paul Brandon, the Administrative Major at Northern, testified that the provision in A.D. 10.7 for two privileged phone calls a month is interpreted as a minimum. He testified credibly that he and other correctional officers tour the facility, and that if they are made aware that an inmate needs to make a telephone call to an attorney, they will usually attempt to honor the inmate's request.
Effective January 1, 1997, the Department of Corrections has an eighteen month, one million one hundred eighty six thousand, nine hundred fifty seven ($1,186,957) dollar contract with Sydney T. Schulman Esq. for the creation and operation of a program known as Inmate Legal Assistance (ILA). By the terms of the contract, the goal of the program is, ". . . to provide and facilitate inmate access to the civil judicial system for claims determined by ILA to be matters wherein a prima facie case is presented through the preparation of legal documents, research, pleadings, motions, supporting memorandum of law and/or out of court oral and/or written advice. . .". Respondent's Exhibit A, Contract, Part II, 2. The contract further provides that the relationship between ILA attorneys and inmates in regard to providing services pursuant to CT Page 5547 the contract shall be considered to be a client-attorney relationship, as defined by the Rules of Professional Conduct. The contract provides that ILA assistance shall not extend to actual representation of an inmate, or the filing of an appearance on behalf of an inmate, in the case in which legal assistance is being provided. Finally, of relevance to the court's consideration of the present claim, the contract provides that ILA shall make every reasonable effort to provide services via mail, telephone, fax, computer or other telecommunications equipment rather than in person, and that ILA shall be responsible for the installation and maintenance of a "1-800" number to facilitate access to the program by eligible inmates.
Attorney Schulman testified that ILA currently has a staff of six attorneys. In addition, the staff includes an investigator, paraprofessionals or secretaries, and law students. Available to staff attorneys are computers, including computerized legal research, and a law library. Additionally, Attorney Schulman indicated that the University of Connecticut Law School library is located less than three miles from the ILA office.
In terms of the scope of the contract, Attorney Schulman reported that in January, 1997, ILA received from inmates four hundred thirty eight pieces of correspondence, two hundred three telephone calls, and conducted thirty six personal interviews. In February, 1997, there were four hundred fifty pieces of correspondence, one hundred sixty telephone calls, thirty five interviews; and in March, 1997, there were five hundred two pieces of correspondence, one hundred eighty five telephone calls, and twenty one personal interviews.
With respect to the access of Northern inmates to ILA, Attorney Schulman testified to his belief that the inmates, with some possible exceptions, have access to ILA through the mails and through telephone calls. He confirmed that ILA does have a "1-800" number at Northern. He believes that inmates are limited to two legal calls a month.
Attorney Schulman testified that a significant portion of their activity relates to inmates confined at Northern, and that these inmates generally get an earlier priority because of the nature of their requests.
During the petitioner's testimony, he complained that he is not afforded the opportunity to receive law books in his cell, and CT Page 5548 he is not able to read law books directly. The court agrees that the petitioner has correctly stated the situation. There is no law library at Northern. Attorney Schulman testified that if an inmate wishes a book, such a request can be problematic because, while ILA has sufficient funds to maintain an adequate library for staff attorneys, there is insufficient funding to provide law books to inmates. He did indicate, however, that if an inmate requests a specific pamphlet, or a particular book, ILA will order it for the inmate at the inmate's cost. More germane to this issue, it is part of ILA's contract to review an inmate's claim, and to make suggestions to the inmate, based on counsel's legal background as applied to the specific allegations, concerning the nature and content of claims an inmate may be able to bring.
The petitioner complained that ILA is inadequate because it takes ninety days for an ILA staff person to respond to an inmate request. The evidence does not support the petitioner's claim. Attorney Schulman testified that while there is an agreement with Corrections that there would be an outside limit of ninety days for ILA to respond to inmate requests, as a matter of norm the turn-around time is less. Attorney Schulman reported that at the beginning of January, 1997, there were eighty six pieces of mail that had not been responded to from October, 1996, but by the end of January each of these had received a response. Additionally, Attorney Schulman stated that at the beginning of February, 1997, ILA had received seventy pieces of correspondence more than sixty days earlier, but that in the month of February all but two received a response. Finally, Attorney Schulman reported that at the beginning of March, 1997, ILA had received sixty pieces of correspondence that had not been responded to from December, 1996, but by the end of the month, each had received a response. From this testimony, the court concludes that ILA does, in fact, respond to essentially all inmate correspondence in less than ninety days from date of receipt.
During the hearing, ILA Staff Attorney Carrie Howard was called to testify by the respondent. Attorney Howard asserted an attorney-client privilege with respect to the content of any conversations between the petitioner and herself, and the court, based on the terms of the ILA contract, honored the assertion of the privilege.[1]
Without discussing the content of conversations or any aspects of her assistance to the petitioner, Attorney Howard indicated her belief that the petitioner has had reasonable access to her with CT Page 5549 respect the underlining issues in this case, and she has responded to his related correspondence.
Attorney Howard testified that, as a staff attorney, she provides legal assistance to prisoners in civil actions. Depending on the needs of a case, her assistance may consist of giving advice, supplying copies of cases or statutes to inmates, and assisting in the preparation and filing lawsuits for inmates who have provided her sufficient evidence of their claims to establish prima facie cases.
Attorney Howard stated that she provides assistance to Northern inmates. In this regard, she indicated that if an inmate asks her for cases related to a civil matter, she will attempt to obtain the materials so long as the request is not too voluminous. Additionally, she indicated that when confronted with an overly burdensome request, she will attempt to help the inmate narrow and concretize his needs.
Finally, as to Attorney Howard's testimony, she indicated that if there is a deadline, she attempts to accommodate an inmates time demands, and she has prepared requests for time extensions where necessary. She is aware of no cases lost by inmates on the basis of untimeliness.
The issue of an inmate's access to court has been addressed by both the United States Supreme Court and the Connecticut Supreme Court. In Bounds v. Smith, 430 U.S. 817 (1977), the U.S. Supreme Court stated that ". . .the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." Id., 828. More recently, the Connecticut Supreme Court, in Washington v. Meachum,238 Conn. 692 (1996), quoted the U.S. Supreme Court as follows:
 "It is now established beyond doubt that prisoners have a constitutional right to access to the courts. . . [and that such access must be] adequate, effective and meaningful."(Citations omitted; internal quotation marks omitted.) Bounds v. Smith, 430 U.S. 817, 821-22, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). Decisions of the United States Supreme Court "have consistently required [s]tates to shoulder affirmative obligations to assure all prisoners meaningful access to the courts. It is CT Page 5550 indisputable that indigent inmates must be provided at state expense with paper and pen to draft legal documents, with notarial services to authenticate them, and with stamps to mail them. States must forgo collection of docket fees otherwise payable to the treasury and expend funds for transcripts. State Expenditures are necessary to pay lawyers for indigent [criminal] defendants at trial, Gideon v. Wainwright,
[supra, 373 U.S. 335]; Argersinger v. Hamlin, [supra, 407 U.S. 25], and in appeals as of right, Douglas v. California, [supra, 373 U.S. 353]." Bounds v. Smith, supra, 824-25. "Bounds does not[, however] guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip and fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any other litigating capacity is simply one of the incidental and perfectly constitutional consequences of conviction and incarceration." Lewis v. Casey, 518 U.S. ___ (64 U.S.L.W. 4587, 4590, June 24, 1996)."
The Supreme Court's recent decision in Lewis v. Casey is a further refinement of the right to access to court earlier articulated by the Supreme Court in Bounds v. Smith, supra,320 U.S. 817 (1977). In Lewis, the court stated that in order for a claimant to establish a Bounds violation, an inmate must show actual particularized injury. The court stated:
 "Because Bounds did not create an abstract, free-standing right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is sub-par in some theoretical sense. That would be the precise analogue of the healthy inmate claiming constitutional violation because of the inadequacy of the prison infirmary. Insofar as the right vindicated by Bounds in concerned, `meaningful access to the courts is the touchstone,' Bounds, 430 U.S., at 823, (internal quotation marks omitted), and the inmate therefore must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal CT Page 5551 claim." Lewis v. Casey, supra, 518 U.S. 6-7 (1996).
In this case, the petitioner's claim is both a wholesale attack on the ILA contract as an inadequate provision for an inmate's access to court, as well as a particularized claim that he has been denied the use of law books. He has no constitutionally-protected right to the latter. And, he has failed to demonstrate that his access to court has been unreasonably impeded by any behaviors, or want of diligence, of ILA staff members, or by any of the provisions of its contract with the respondent. His attack, therefore, falls both short and wide of the mark.
Accordingly, the petitioner's motion for legal books is denied.
Bishop, J.